# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **VERAX BIOMEDICAL INC.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | **Civil Action No. 1:23-cv-10335-PBS** |
| | § | |
| **AMERICAN NATIONAL RED CROSS,** | § | |
| | § | |
| **Defendant.** | § | |
| | § | |

---

## VERAX BIOMEDICAL INC.'S OPPOSITION TO
## AMERICAN NATIONAL RED CROSS'S
## MOTION TO DISMISS

---

Benjamin M. Stoll
Scott Abeles
CARLTON FIELDS, P.A.
Suite 400 West
1025 Thomas Jefferson Street, NW
Washington, DC 20007
Telephone:  (202) 965-8100

Elizabeth K. Keeley
BUTTERS BRAZILIAN LLP
699 Boylston Street, 12th Floor
Boston, Massachusetts 02116
Telephone:  (617) 367-2600

*Attorneys for Plaintiff Verax Biomedical Inc.*

**TABLE OF CONTENTS**

*Page*

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ........................................................................................................... 1

FACTUAL BACKGROUND ............................................................................................. 1

ARGUMENT ................................................................................................................. 5

I.      THE RED CROSS IS A "PERSON" SUBJECT TO THE SHERMAN ACT. ................. 6

II.     ARC'S DEFENSES ALL FAIL BECAUSE ARC COMPETES WITH VERAX IN
        THE TIED MARKET FOR BACTERIA MITIGATION SERVICES. ........................... 10

        A.      ARC Sells Pathogen Reduction Separately from Platelets in the Tied Market
                for Bacteria Mitigation Services. .......................................................... 10

                1.      ARC Sells Two Products:   Platelets and Bacteria Mitigation
                        Services. ............................................................................ 10

                2.      ARC and Verax Compete in the Tied Market of Bacteria Mitigation
                        Services. ............................................................................ 13

        B.      Verax Has Suffered an Antitrust Injury and Therefore Has Standing to Sue
                ARC. ...................................................................................... 15

        C.      ARC's Anticompetitive Conduct Has Harmed Consumers in Addition to
                Verax. ..................................................................................... 17

III.    VERAX HAS ADEQUATELY PLED A CLAIM UNDER MASS. GEN. LAWS
        SECTION 93A. ........................................................................................... 17

IV.     VERAX HAS ADEQUATELY PLEADED TORTIOUS INTERFERENCE. ................... 19

V.      VERAX'S DEFAMATION CLAIM IS WELL PLEADED. ........................................ 20

CONCLUSION ............................................................................................................. 20

CERTIFICATE OF SERVICE ......................................................................................... 22

# TABLE OF AUTHORITIES

*Page*

## Cases

*Arkansas v. Farm Credit Services of Central Arkansas*,
    520 U.S. 821 (1997)........................................................................................7

*Bradley v. Dean Witter Realty, Inc.*,
    967 F. Supp. 19 (D. Mass. 1997)..................................................................18

*Brown Shoe Co. v. United States*,
    370 U.S. 294 (1962)......................................................................................16

*F.T.C. v. Phoebe Putney Health System, Inc.*,
    568 U.S. 216 (2013)........................................................................................6

*F.T.C. v. Superior Court Trial Lawyers Ass'n*,
    493 U.S. 411 (1990)........................................................................................6

*Federal Housing Administration, Region No. 4 v. Burr*,
    309 U.S. 242 (1940)........................................................................................7

*Fishman Transfucers, Inc. v. Paul*,
    684 F.3d 187 (1st Cir. 2012)........................................................................19

*Flovac, Inc. v. Airvac, Inc.*,
    817 F.3d 849 (1st Cir. 2016)........................................................................14

*Hanrahran v. Specialized Loan Servicing, LLC*,
    54 F. Supp. 3d 149 (D. Mass. 2014) ...........................................................18

*HipSaver, Inc. v. Kiel*,
    984 N.E.2d 755 (Mass. 2013) ......................................................................20

*Jefferson Parish Hospital District No. 2 v. Hyde*,
    466 U.S. 2 (1984)..........................................................................................11

*Keifer & Keifer v. Reconstruction Finance Corp.*,
    306 U.S. 381 (1939)........................................................................................6

*Kuwaiti Danish Computer Co. v. Digital Equipment Corp.*,
    781 N.E.2d 787 (Mass. 2003) ......................................................................18

*LePage's Inc. v. 3M*,
    324 F.3d 141 (3d Cir.2003)..........................................................................16

**TABLE OF AUTHORITIES**
(continued)

*Page*

*Marcella v. Brandywine Hospital,*
    47 F.3d 618 (3d Cir. 1995)......................................................................7, 8, 9

*McCarthy v. Middle Tennessee Electric Membership Corp.,*
    466 F.3d 399 (6th Cir. 2006) .............................................................................8

*In re Nexium (Esomeprazole) Antitrust Litigation,*
    968 F. Supp. 2d 367 (D. Mass. 2013) ..............................................................6

*In re Pharmaceutical Industry Average Wholesale Price Litigation,*
    582 F.3d 156 (1st Cir. 2009).............................................................................18

*Rife v. One West Bank, F.S.B.,*
    873 F.3d 17 (1st Cir. 2017)................................................................................7

*SAS of Puerto Rico, Inc. v. Puerto Rico Telephone Co.*
    48 F.3d 39 (1st Cir. 1999).................................................................................16

*Sea-Land Service, Inc. v. Alaska Railroad,*
    659 F.2d 243 (D.C. Cir. 1981)...........................................................................8

*Sensitech Inc. v. Limestone FZE,*
    548 F. Supp. 3d 244 (D. Mass. 2021) .............................................................19

*Serpa Corp. v. McWane, Inc.,*
    199 F.3d 6 (1st Cir. 1999)................................................................................15

*Sonoran Scanners, Inc. v. Perkinelmer, Inc.,*
    585 F.3d 535 (1st Cir. 2009).............................................................................18

*Stamatakis Industries, Inc. v. King,*
    965 F.2d 469 (7th Cir.1992) ............................................................................15

*Sterling Merchandising, Inc. v. Nestle, S.A.,*
    656 F.3d 112 (1st Cir. 2011).............................................................................15

*Steward Health Care System, LLC v. Blue Cross & Blue Shield of Rhode Island,*
    997 F. Supp. 2d 142 (D.R.I. 2014).....................................................................5

*Trans-Spec Truck Service, Inc. v. Caterpillar Inc.,*
    524 F.3d 315 (1st Cir. 2008)..............................................................................5

## TABLE OF AUTHORITIES
(continued)

*Page*

*United States Postal Service v. Flamingo Industries (USA) Ltd.*,
    540 U.S. 736 (2004)..............................................................................................7, 8, 9

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) .................................................................................12, 13

*Vazquez-Ramos v. Triple-S Salud, Inc.*,
    55 F.4th 286 (1st Cir. 2022)........................................................................................15

*Vranos v. Skinner*,
    930 N.E.2d 156 (Mass. App. Ct. 2010) .......................................................................19

*ZF Meritor, LLC v. Eaton Corp.*,
    769 F. Supp. 2d 684 (D. Del. 2011), *aff'd*, 696 F.3d 254 (3d Cir. 2012)..........................16

## Statutes

15 U.S.C. § 7 .................................................................................................................7

36 U.S.C. § 2 .................................................................................................................7

Massachusetts General Laws § 93A ...............................................................17, 18, 19

## INTRODUCTION

In its Motion to Dismiss (ECF No. 18, "Motion," or "Mot."), the American Red Cross ("ARC") portrays Verax's straightforward antitrust (and related) claims as far more complicated than they are. Verax's Complaint (ECF No. 1, "Compl.") presents textbook antitrust claims under the Sherman Act: ARC is a monopolist in the sale of platelets to hospitals; ARC is leveraging this market power through tying agreements and exclusive dealing to foreclose competition in a separate market for bacteria mitigation services; and, as a result of that leveraging and foreclosure, ARC has eliminated choice and raised prices for consumers in the foreclosed market. This is the quintessential "antitrust injury" the Sherman Act was enacted to patrol.

ARC can only claim otherwise by disputing the facts alleged in the Complaint, attempting to recast the definition of the relevant products, its role in the relevant markets, and the types of harm its actions have caused. ARC goes so far as to claim that, though it has a monopoly share of a critical private market, the antitrust laws do not apply to it. ARC's contentions contradict both the facts of the Complaint and reality.[1]

## FACTUAL BACKGROUND

Platelets are a life-saving blood product collected from unpaid donors by blood centers, which then sell the platelets to hospitals at $460/dose or more. Compl. ¶¶ 3, 33, 34, 99. Platelets are not a substitute for other blood products and constitute a distinct product market. *Id.* ¶¶ 186, 187. ARC does not deny that the U.S. platelet market is a well-defined antitrust market. *Id.* ¶¶ 186–192. Nor does ARC deny that it has market power in this tying market. *Id.* ¶¶ 39–42, 209–224. That market power is exacerbated by the chronic supply shortage of platelets, which often leaves ARC's customers with no choice but to buy from ARC. *Id.* ¶¶ 38, 219, 222. ARC's market

---

[1] Unless otherwise indicated, all emphasis is added and internal citations are omitted.

power is protected by the considerable fixed-cost and network-effect barriers to entry into the U.S. platelet market. *Id.* at 225–229.

Platelets have a very short shelf life and are susceptible to bacterial contamination. *Id.* ¶ 46. Since 2004, ARC mitigated this risk by testing single-donor platelets for contamination shortly after collection, which is called primary culturing. *Id.* ¶¶ 49–51. In 2015, the FDA required blood centers and hospitals to take steps "to assure that the risk of bacterial contamination of platelets is adequately controlled." *Id.* ¶¶ 47. In 2019, the FDA expressly and specifically endorsed ***three*** ways to mitigate contamination risk: (1) adding a second test for contamination near the time of transfusion ("Secondary Testing"); (2) replacing the primary culture with a test performed on a much larger sample after at least a 36–48 hour delay ("Large Volume Delayed Sampling" or "LVDS"); and (3) combining the platelets with a DNA cross-linker and exposing the mixture to ultraviolet light to attempt to inactivate any bacteria present ("pathogen reduction" or "PRT"). *Id.* ¶¶ 53, 63–92. These products are substitutes; hospitals only purchase one, and each meets the FDA's mitigation requirements. *Id.* ¶ 58.

Prior to July 2020, ARC primarily sold untreated platelets compatible with both LVDS and Secondary Testing, and for hospitals that wanted ARC's PRT, it also separately offered platelets treated with PRT. *Id.* ¶ 93. In this competitive market, the vast majority of hospitals that purchased bacteria mitigation services purchased ***Verax's*** low-cost and effective PGD*prime* test, hardly a product that was "flailing" or failing to prove its "value proposition," as ARC absurdly contends. *See* Mot. at 1. During this time, very few hospitals purchased the expensive and platelet-degrading PRT, so ARC made very little money selling that service in the bacteria mitigation services market. Compl. ¶¶ 66–69.

This changed in July 2020, when ARC announced it would no longer sell platelets separate from its PRT service, denying platelet consumers the option of using a different bacteria mitigation service or service provider. *Id.* ¶¶ 96–97. Instead of paying $25/dose to Verax for bacteria mitigation services, hospitals were now required to pay $150/dose to ARC.

ARC's motion subtly, but materially, attempts to alter these facts.

<u>First</u>, ARC repeatedly talks of "manufacturing" platelets, as if selling them involves a complex assembly process. Mot. at 1, 2, 5, 6, 7, 8, 13, 18. It does not. ARC does not "manufacture" platelets any more than Exxon "manufactures" crude oil. Instead, just as Exxon extracts crude oil from the ground, ARC extracts platelets from altruistic unpaid donors. Before the oil Exxon extracts can be put into a vehicle in the form of what one might call "EPA-compliant unleaded gasoline," Exxon engages in a separate refining service to convert the oil into gasoline. Refining can be done by a separate company, or Exxon can vertically integrate into that market. Either way, these are separate services. So too with platelets and bacteria mitigation services. After platelets are collected, but before they can be transfused, they must be "refined," in the sense that they must be treated with a bacteria mitigation service. Compl. ¶¶ 33–34, 39, 99. The Complaint shows ARC decided to vertically integrate into the bacteria mitigation services market, tie that service to its monopoly product (platelets), and sell those services at a massive mark-up, foreclosing competition in the bacteria mitigation services market and injuring consumers.

As the Complaint spells out, PRT—like the other bacteria mitigation services—is performed on platelets ***after*** and ***separately*** from the collection process. *Id.* ¶ 65. As a result, platelets and bacteria mitigation services are separate products with separate demands in separate markets. *Id.* ¶¶ 186–208. Prior to ARC's decision to vertically integrate, ARC sold most of its platelets without PRT, and most of ARC's platelet customers purchased their bacteria mitigation services from a seller other

than ARC. *Id.* ¶¶ 93, 103. ARC could resume selling platelets without PRT tomorrow without any change in the way ARC collects its platelets. Notably, ARC even identifies the prices for its bacteria mitigation services separately from the price of its platelets: $150/dose for PRT and $82/dose for LVDS. *Id.* ¶¶ 69, 83.

Second, ARC repeatedly invokes the idea of "FDA-compliant platelets," a lawyer-generated concept that has no basis in the law, the Complaint, or reality.  Mot. at 3, 6, 7, 8, 13, 15. There is **no such thing** as FDA-complaint or non-FDA-complaint platelets. The FDA has never mandated that platelets take any particular form; instead, the FDA requires only that some steps be taken to reduce the risk of bacterial contamination after platelets are collected and before they are transfused into humans. Compl. ¶¶ 53, 56. The FDA has expressly endorsed three different bacteria mitigation services as being equally sufficient: Secondary Testing, LVDS, and PRT. *Id.* ¶ 59. Critically, **the FDA does not mandate that ARC use PRT**.  The fact that the FDA requires that some sort of bacteria mitigation service be performed on platelets at some point before they are transfused does not somehow grant ARC a license to monopolize the bacteria mitigation services market, any more than the Environmental Protection Agency's requirement that gasoline be unleaded would entitle Exxon to monopolize the oil refining market. To the contrary, ARC's anticompetitive actions are not just contrary to the antitrust laws but also to public health. As the Complaint shows, independent health organizations have opined that multiple bacteria mitigation service options should be available to ensure competition and consumer choice.  ARC's price-raising conduct prevents this, stripping critical resources from historically cash-strapped hospitals and forcing them to accept an inferior product that has already been linked to two fatalities. *Id.* ¶¶ 61–62, 149–158.

*     *     *

-4-

ARC claims that its tying policy was driven by the medical advantages of PRT, Mot. at 3, but that is a contested factual issue, and the profit motive to engage in this anticompetitive behavior is obvious.[2] Consumers and medical experts complained bitterly about ARC's decision, but were powerless to stop it. Compl. ¶¶ 138–147. ARC is the biggest—and often only—supplier of platelets, so hospitals often have no choice but to buy from ARC. *Id.* ¶¶ 209–224. Within months of ARC's announcement, PGD*prime*'s share of the market dropped from roughly 75% to less than 2% (resulting in an 85% decline in Verax's revenues), while ARC's share skyrocketed. Because of ARC's tying policy—and the other anticompetitive and tortious conduct the Complaint describes—consumers now pay higher prices for a bacteria mitigation service that results in a lower quality platelet. *Id.* ¶¶ 149–159; 174–185. Unless ARC's anticompetitive actions are enjoined, competition will continue to be foreclosed, and consumers will continue to suffer.

## ARGUMENT

The Court "must accept as true all of the factual allegations in the complaint," and "construe all reasonable inferences in favor of [Verax]." *Steward Health Care Sys., LLC v. Blue Cross & Blue Shield of R.I.*, 997 F. Supp. 2d 142, 151 (D.R.I. 2014) (citations omitted). Thus, all of the factual allegations in ARC's motion that are outside of—or inconsistent with—the Complaint's allegations must be disregarded. *Trans-Spec Truck Serv., Inc. v. Caterpillar Inc.*, 524 F.3d 315, 321 (1st Cir. 2008). Because a motion to dismiss merely tests the sufficiency of the

---

[2] Though the issue of product quality is an unresolvable fact issue on this Motion, it is worth noting that ARC's contention that PRT is superior to PGD*prime* (because PRT treats platelets rather than testing them) is misleading, if not outright false. As described in the Complaint, Compl. ¶¶ 149–153, PRT significantly degrades the quality of platelets. *Id.* ¶ 67. And while a positive result using Verax's test results in the specimen tested being discarded, use of PRT results in the loss of 10–15% of every treated dose, resulting in greater platelet loss overall and the need for increased platelet transfusions in some patients. *Id.* ¶¶ 66, 160–173.

pleadings, so ARC's "burden 'is a heavy one.'" *In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d 367, 385 (D. Mass. 2013).

I.    **THE RED CROSS IS A "PERSON" SUBJECT TO THE SHERMAN ACT.**

When Verax began its Complaint by noting that the antitrust laws apply to "everyone," including the Red Cross, it did not anticipate that this non-controversial and equitable principle would be the subject of a motion to dismiss. *See* Compl. ¶ 1. Nonetheless, that is what ARC literally posits in its lead argument, and effectively posits in the remainder, relying on its reputation for good works outside of its dominant role in private blood platelet markets as a fulcrum to convince this Court that it could not possibly be liable for the claims Verax sets out.

The federal reports are filled with public interest-oriented defendants who failed to persuade courts with similar arguments. *See, e.g., F.T.C. v. Superior Ct. Trial Laws. Ass'n,* 493 U.S. 411, 412–13 (1990) (despite noble cause and good intentions, conspiracy among defense attorneys for the indigent subject to *per se* condemnation under Section 1); *F.T.C. v. Phoebe Putney Health Sys., Inc.*, 568 U.S. 216, 232 (2013) (non-profit public health authorities subject to antitrust regulation). And, in this case, discovery will show that while ARC's public-facing role has often consisted of admirable acts, in its private-market role ARC is as hard-edged a competitor as they come. It is in this role that ARC has crossed legal lines to which, like everyone else, it is subject.

ARC leads with the argument that, as a "federally chartered instrumentality of the United States," it is not "a 'person' who can be liable under the Sherman Act." Mot. at 9. Its argument does not proceed beyond this simplistic notion, that it is immune because it is a federal instrumentality.  That is not the law. While the Unites States is immune from most suits, absent its consent, its sovereign immunity does *not* extend to its agents and instrumentalities merely because they do its work. *See Keifer & Keifer v. R.F.C.*, 306 U.S. 381, 388 (1939). Stated plainly, an entity

is not entitled to the same immunities as the United States simply by virtue of its federal instrumentality status. *See Arkansas v. Farm Credit Servs. of Cent. Ark.*, 520 U.S. 821, 832 (1997). The bottom line is that "[t]he Red Cross is not given wholesale governmental immunity simply by virtue of its federal charter." *Marcella v. Brandywine Hosp.*, 47 F.3d 618, 624 (3d Cir. 1995).

      The two-part test for determining whether a federal instrumentality escapes liability under the Sherman Act appears in ARC's key case, but, curiously, not in its Motion. A Court first evaluates "whether there is a waiver of sovereign immunity" in the entity's charter through a "sue-and-be-sued clause." *U.S. Postal Serv. v. Flamingo Indus. (USA) Ltd.*, 540 U.S. 736, 743 (2004). If so, the court proceeds to the second step and examines "whether the substantive prohibitions of the Sherman Act apply to" the entity in question. *Id.*[3] ARC has "the power to sue and be sued." *Marcella*, 47 F.3d at 622 (citing 36 U.S.C. § 2). Its waiver is given an "expansive" construction. *Flamingo*, 540 U.S. at 741–42. Doing so makes sense: "[I]t must be presumed that when Congress launched a governmental agency into the commercial world and endowed it with authority to 'sue or be sued,' [it] is not less amenable to judicial process than a private enterprise." *Fed. Hous. Admin. v. Burr*, 309 U.S. 242, 245 (1940).

      The second step considers whether "substantive antitrust liability defined by the statute extends to" ARC. The Sherman Act's plain text extends to ARC. It imposes liability on any "person," defined to "include corporations and associations existing under or authorized by the laws of either the United States, the laws of any of the Territories, the laws of any State, or the laws of any foreign country." 15 U.S.C. § 7. As the Supreme Court explains, "[i]t follows … that

---

[3] By ignoring the test that applies to the question it has injected into the case, ARC has waived any arguments that it satisfies the applicable test, save for the one it provides, that its status as an instrumentality *ipso facto* makes it not an antitrust "person." *See Rife v. One W. Bank, F.S.B.*, 873 F.3d 17, 19 (1st Cir. 2017) ("arguments not raised in an opening brief, but instead raised only in a reply, are deemed waived."). ARC's waiver is immaterial because it flunks the applicable test.

corporate or governmental status in most instances is ***not*** a bar to the imposition of liability on an entity as a 'person' under the Act." *Flamingo,* 540 U.S. at 744–45.

    *Flamingo* establishes that ARC is no different than any other corporation under the Sherman Act. *Id.* at 744. *Flamingo* analyzed "whether for purposes of the antitrust laws the Postal Service is a person separate from the United States itself." *Id.* at 746. It noted that the Postal Service is "part of the Government." *Id.* But if Congress chose "to create the Postal Service as a ***federal corporation***, we would have to ask whether the Sherman Act's definition extends to the federal entity under this part of the definitional text." *Id.* at 746.[4]

    ARC is organized as a corporation. The Sixth Circuit, addressing an analytically indistinguishable defense by the Tennessee Valley Authority (TVA), cited this portion of *Flamingo* and the fact that TVA, like ARC, was organized as a federal corporation as grounds for rejecting TVA's argument that it was not a Sherman Act "person." *See McCarthy v. Middle Tenn. Elec. Membership Corp.*, 466 F.3d 399, 412–14 (6th Cir. 2006) ("[T]he key distinction presented by *Flamingo*, that the TVA is a federal corporation unlike the Postal Service, supports the conclusion that the TVA is not immune from antitrust liability on these grounds"). The same analysis applies to ARC.

---

[4] It follows that ARC's claim that "*Flamingo* … made clear that federal instrumentalities do not fall within the definition of a 'person; under the Sherman Act" is untrue. Mot. at 11. *Flamingo* found a ***particular*** agency is not a Sherman Act "person," not that all federal instrumentalities are non-persons. Were ARC right, there would be no need for *Flamingo's* two-part test. ARC engages in similar mischief regarding *Sea-Land Serv., Inc. v. Alaska R.R.*, 659 F.2d 243, 244 (D.C. Cir. 1981). *Sea-Land* considered whether a railroad "***wholly owned and operated by the United States,*** is amenable to suit" under the Sherman Act. *Sea-Land* has no application, obviously, because ARC is not owned by the government. Nonetheless, ARC grasps at the part of the opinion that states "Congress did not place the United States or its instrumentalities under the governance of the Sherman Act." *Sea-Land* later clarified in its ***holding***: "[W]e hold that the United States, its ***agencies and officials***, remain outside the reach of the Sherman Act." *Id.* at 246. The "Red Cross is not 'an agency' of the federal government." *Marcella*, 47 F.3d at 622.

*Flamingo's* reasoning hammers this home. As it explained, the Postal Service is an "independent establishment of the executive branch of the Government of the United States," and "is part of the Government." 540 U.S. at 744. Perhaps most notably, it is endowed with a monopoly over the handling of U.S. mail, so it would make little sense for Congress to then subject it to the Sherman Act, which patrols monopolistic behavior. *Id.* at 741. The Postal Service also has "significant governmental powers," including law enforcement, "the power of eminent domain," and "the power to make postal regulations." *Id.* Critically, the Postal Service "lacks the prototypical means of engaging in anti-competitive behavior: the power to set prices." *Id.* at 747.

ARC shares precisely ***none*** of these things in common with the Postal Service. It is not part of any "branch" of the federal government, and routinely (and correctly) trumpets its independence from any government's control. It sets its own prices with impunity. In rejecting a different immunity claim by ARC, immunity from a jury trial, the Third Circuit explained that:

> [T]he federal government does not manage the day-to-day activities of [ARC], does not provide the funds to support its activities, and does not employ or grant civil service benefits to its workers. In addition, to properly fulfill its role … the Red Cross must be independent of the United States government.

*Marcella*, 47 F.3d at 624.

Though this argument is not close, it is worth noting, finally, that it would be poor public policy to extend antitrust immunity to entities like ARC. Congress can make an agency like the Postal Service immune because if it acts anticompetitively, Congress itself, or the Executive branch, could discipline it through the control they exercise over it, including its budget. If ARC's view were correct, then ARC's anticompetitive actions – along with the competitively suspect actions of all other federal instrumentalities, and perhaps even all federal government contractors, who also perform work on the government's behalf – would be beyond the reach of ***anyone***,

including the executive branch, its enforcers, the political process, and the judiciary. There is no sound policy basis for such a counter-intuitive and fraught result.

## II.    ARC'S DEFENSES ALL FAIL BECAUSE ARC COMPETES WITH VERAX IN THE TIED MARKET FOR BACTERIA MITIGATION SERVICES.

ARC's objections to Verax's antitrust claims—lack of antitrust injury, lack of a tied product, and lack of harm to competition—all arise from ARC's central thesis that Verax has not defined a tied market in which Verax and ARC sell competing products. That thesis is false.

The tied market is not hard to identify. It consists of the FDA-endorsed services applied to platelets to reduce the risk of bacterial contamination: PRT, LVDS, and Secondary Testing. The consumers in this market are hospitals. The primary sellers are ARC (PRT), Verax (PGD*prime*), and BioMerieux (BacT/ALERT and LVDS). ARC is 100% correct that "hospitals that receive pathogen reduced platelets are less likely to use Verax's PGD*prime*." Mot. at 3. That is because ARC's pathogen reduction service and Verax's PGDprime are substitutes in the same tied market.

### A.    ARC Sells Pathogen Reduction Separately from Platelets in the Tied Market for Bacteria Mitigation Services.

The Motion lodges two arguments for why ARC is not a seller in the tied market for bacteria mitigation services: (1) ARC does not sell any service at all and instead only sells one product, "FDA-compliant platelets," *see* Mot. at 8, 13, 15; and (2) ARC does not sell into the tied market, *id.* at 6, 7, 13, 15. Neither argument holds water.

#### 1.    ARC Sells Two Products:  Platelets and Bacteria Mitigation Services.

ARC argues that because it incorporates PRT into its platelet manufacturing process before offering its platelets to the market, it sells a "single" product, and that product is sold in the blood platelets product market, not the bacteria mitigation services market. *Id.* at 4, 7, 13, 15.  The factual predicate for this argument is false and contradicts the allegations in the Complaint, which explain

that PRT is entirely separate from the platelet collection process and is not incorporated into it in any way.

Factual inaccuracies aside, ARC is not the first antitrust defendant to allege that by combining two products into one it magically renders itself immune from tying claims. That argument was rejected forty years ago in the Supreme Court's seminal *Jefferson Parish Hospital District No. 2 v. Hyde* decision. 466 U.S. 2 (1984). That case addressed an arrangement in which a hospital conditioned surgical care on the purchase of anesthesiological services supplied by a third party physicians group with which it contracted. *Id.* at 7. The hospital combined its own surgical services and the third party anesthesiological service and offered the bundled services as a single, integrated package. *Id.* at 18-19. The hospital argued (just as ARC does here) that because the services are integrated, there is only one product and no tying has occurred. The *Jefferson Parish* Court rejected this formalistic reasoning. Instead, the Court held that the injuqry into whether there is one product or two "depends on whether the arrangement may have the type of competitive consequences addressed by the rule [against tying]." *Id.* at 21. An arrangement may have those consequences, Justice Stevens explained, if the products had separate "demands," *i.e.,* they could be sold *either* separately, or together. *Id.* at 21–22. That the hospital first acquired the tied service from a third party before forcing it on patients was irrelevant to the analysis. It is likewise irrelevant here that ARC buys its pathogen reduction equipment from Cerus before performing the pathogen reduction service it sells to hospitals in competition with Verax's PGD*prime* test.

And just as anesthesiological and other services in *Jefferson Parrish* had separate demands, *see id.* at 22 & n.36, so too do platelets and bacteria mitigation services. ARC does not deny that

there is separate demand for these two products—indeed, ARC does not engage in the proper analysis at all—and the marketplace prior to July 2020 makes such a denial untenable.

The landmark *Microsoft* case provides a more recent example. The government alleged violations of both Section 1 and Section 2 based (in relevant part) on Microsoft's bundling of its monopoly product, Windows, with a competitive product, Internet Explorer ("IE"). By forcing IE on purchasers, the government alleged that Netscape Navigator was foreclosed from the browser market. The district court held that the integration of Windows and IE violated both Section 1 and Section 2, rejecting Microsoft's contention that it sold the products as an integrated, single product. *See United States v. Microsoft Corp.*, 253 F.3d 34, 45 (D.C. Cir. 2001). The Court of Appeals overturned the district court's Section 1 determination—not because it found a single product instead of two, but because it thought the technological aspects of the tie warranted further examination under the rule of reason. *Id.* at 84.

The D.C. Circuit, however, ***affirmed*** the Section 2 finding, for monopoly maintenance, based on the integration of IE with Windows. Microsoft's tying "reduce[d] the usage share of rival browsers not by making Microsoft's own browser more attractive to consumers but, rather, by discouraging OEMs from distributing rival products." *Id.* at 65. Because its conduct, "through something other than competition on the merits, has the effect of significantly reducing usage of rivals' products," it was "anticompetitive." *Id.*

A similar analysis applies here. ARC's conduct has nearly wiped out Verax's share of the tied market, not by making the mitigation services ARC offers more attractive, but by discouraging hospitals from purchasing Verax's test, through its bundle. By driving out competition through something other than "competition on the merits," ARC's conduct is similarly anticompetitive.

It bears emphasis that Microsoft's case for single product treatment was *far* stronger than the one ARC presents. Microsoft invented both Windows and IE and always offered them as a bundle, while ARC only recently started to combine blood platelets with PRT while preventing consumers from acquiring the good and service separately. Microsoft charged a single price for its Windows products, which included IE (at no additional charge), *see* 253 F.3d at 84, while ARC specifies an additional charge for its mitigation services, and a substantial one at that. Compl. ¶ 69. There were also apparent performance advantages to integrating Windows with IE, and disadvantages to pulling the products apart. Not so here. There is no physical or technological integration of ARC's platelet collection and pathogen reduction processes. They are performed separately and each can be fully performed without the other. ARC can start and stop running pathogen reduction without any changes to its collection process. That is because these are separate products.

> 2.     *ARC and Verax Compete in the Tied Market of Bacteria Mitigation Services.*

ARC claims that its pathogen reduction service is not part of the same market as Verax's PGD*prime* test. Mot. at 8, 11–13. To do so, ARC rewrites the definition of the tied market from "the products ***bought by hospitals*** to mitigate the risk of bacterial contamination" to "technology or equipment that a hospital or blood center can use to perform bacteria mitigation." *Id.* at 13, 15. By subtly changing the market definition, ARC attempts to sneak out of the market. The Court should not allow this trickery, especially on a motion to dismiss where the Complaint's market definition should be taken as true.

ARC denies that its PRT competes with PGD*prime* and BacT/ALERT because PRT is a service performed by ARC, while PGD*prime* and BacT/ALERT are tests sold to and used by hospitals. *Id.* at 13. But it is function, not form, that determines the contours of a product market.

By ARC's logic, take-home COVID tests do not compete with drive-through COVID testing centers simply because the consumer performs one test, and the testing center performs the other.[5] Moreover, in theory there is no reason PRT could not be performed by hospitals (this does not happen in practice simply because the high cost of PRT makes it uneconomical).

ARC's motion ignores the legal standard for defining a market: product interchangeability from the consumer's perspective:

> Determining the scope of a product market begins with examining the universe of products that are considered "reasonably interchangeable by consumers for the same purposes." … The market is established by examining both the substitutes that a consumer might employ and "the extent to which consumers will change their consumption of one product in response to a price change in another, i.e., the 'cross-elasticity of demand.'

*See Flovac, Inc. v. Airvac, Inc.*, 817 F.3d 849, 854 (1st Cir. 2016). Under the proper legal framework PGD*prime* and ARC's PRT are substitutes. They are purchased by the same consumers, hospitals, for the same reason, complying with FDA bacterial mitigation requirements. Hospitals buy one or the other, not both. Hospital staff will testify that they view PGD*prime* and PRT as substitutes (and that they prefer PGD*prime*), and economic experts will opine that the two products have a high degree of cross-elasticity of demand. Indeed, the only reason hospitals are not choosing between PGD*prime* and ARC's PRT today is that ARC won't let them—it is forcing hospitals to buy its PRT by refusing to offer platelets without it.

*     *     *

Even if there were good faith questions about whether ARC sells one product or two, or about the contours of the tied market, those questions would be factual, not legal in nature. On the

---

[5] By way of additional example, Best Buy sells TV wall-mounts and also sells a service whereby a technician comes to your house and installs a TV on the wall. These two products are substitutes even though one is a good that the consumer uses herself and the other is a service performed by a professional. The consumer chooses one or the other, but not both, to accomplish the same goal.

face of the Complaint, Verax has plausibly alleged that separate tying and tied markets exist and that ARC participates in both markets, which is all that is required on this Motion. *See Vazquez-Ramos v. Triple-S Salud, Inc.*, 55 F.4th 286, 297 (1st Cir. 2022) ("The matter of market definition cannot be resolved on the face of the complaint." (citations omitted)).

### B.     Verax Has Suffered an Antitrust Injury and Therefore Has Standing to Sue ARC.

ARC's contends that Verax has not alleged "antitrust injury," or the type of harm "the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." Mot. at 11–12 (quoting *Sterling Merch., Inc. v. Nestle, S.A.*, 656 F.3d 112, 121 (1st Cir. 2011). At its heart, the "antitrust injury" inquiry ask whether consumers have been (or are likely to be) injured by the same conduct that has injured the plaintiff, in the same market. Raising prices and/or reducing output is the type of harm to consumers that the antitrust laws were intended to prevent, so when a competitor is harmed by this same conduct, it has suffered an antitrust injury. *See, e.g., Stamatakis Indus., Inc. v. King*, 965 F.2d 469, 471 (7th Cir. 1992) ("The [Supreme Court's] antitrust injury doctrine ... 'requires every plaintiff to show that its loss comes from acts that reduce output or raise prices to consumers.'"). Verax has alleged that it was harmed by the same conduct by ARC that raised prices and reduced competition for consumers.

ARC's assertion that Verax has only been "derivatively injured" is nonsense because the Complaint plausibly alleges that Verax is "a participant in the very market where competition is impaired." Mot. at 12. Specifically, the Complaint alleges that hospitals (the consumers) used to buy Verax's PGD*prime* to satisfy their regulatory obligations, but—due solely to ARC's tying policy and market power in the tying market—they now buy ARC's PRT instead. PRT and *PGDprime* directly compete with each other and are considered substitutes by consumers. Because ARC is restraining the same market where Verax sells its product, Verax is being directly, not

derivatively, injured by ARC's illegal conduct and presumptively has antitrust standing.[6] *Serpa Corp. v. McWane, Inc.*, 199 F.3d 6, 10 (1st Cir. 1999) ("[C]onsumers or **competitors** of the defendant in the allegedly restrained market are presumed to have suffered a cognizable antitrust injury.").

ARC's anticompetitive conduct simultaneously (i) forecloses Verax from the tied market, resulting in lost sales, customers, and revenue; and (ii) reduces consumer choice, deters entry, and raises prices. The alleged foreclosure of the tied market is ***precisely*** what causes consumer harm. No more need be alleged to establish antitrust injury in tying or exclusive dealing cases specifically, or Section 2 cases more generally; such cases are concerned with foreclosure because that is the means by which the defendant imposes antitrust injury. *See, e.g., ZF Meritor, LLC v. Eaton Corp.*, 769 F. Supp. 2d 684, 691 (D. Del. 2011), *aff'd*, 696 F.3d 254 (3d Cir. 2012) ("Foreclosure" is "a form of antitrust injury, especially where the foreclosure is by a monopolist.") (citing *LePage's Inc. v. 3M*, 324 F.3d 141, 157–58 (3d Cir.2003) and *Brown Shoe Co. v. U.S.* , 370 U.S. 294, 329 (1962)).

This case is very different than *SAS of Puerto Rico, Inc. v. Puerto Rico Telephone Co.* 48 F.3d 39 (1st Cir. 1999). In *SAS*, the plaintiff sold high-tech pay phones, while the defendant bought pay phones and used them to sell phone services (*i.e.*, long-distance phone calls) to consumers in Puerto Rico. The *SAS* Court correctly concluded that the plaintiff and defendant sold to different customers—the plaintiff sold to the defendant and the defendant sold to consumers—in different

---

[6] Competitors, such as Verax, are often the ***best*** enforcers of the antitrust laws, since they have intimate knowledge of the defendant's actions, and the means and motivation to do something about them. This case presents a sterling example for why this is so: hospitals (the consumers) cannot be expected to sue ARC because they depend on ARC for their platelet needs.

markets. *Id.* at 41–42. Here, ARC and Verax sell to the same hospital customers, and those customers consider ARC's and Verax's products to be substitutes.

### C.    ARC's Anticompetitive Conduct Has Harmed Consumers in Addition to Verax.

ARC asserts that Verax has not alleged an injury to competition, or "an impairment of the competitive structure of the market." *See* Mot. at 16–17. This assertion is surprising because the Complaint contains an entire section chronicling the ways in which ARC is harming competition ("ARC's Illegal and Anticompetitive Conducts Harms Consumers in Numerous Ways"), which runs five pages and 37 paragraphs.  Compl. ¶¶ 148–185. This section describes textbook antitrust harms including market foreclosure and loss of consumer choice (*id.* ¶¶ 174–180), inhibited innovation (*id.* ¶¶ 181–185), and higher consumer prices (*id.* ¶¶ 167–180). As to higher prices, the Complaint even specifies them: consumers are now paying ARC $15/dose for bacteria mitigation services they used to acquire from Verax for $25/dose. *Id.* ¶¶ 69, 91, 167.

The Complaint even alleges the very form of competitive harm that ARC's motion acknowledges is sufficient:  "reducing the nature or number of competitors in that purported market." Mot. at 16. The Complaint explains that ARC's anticompetitive conduct has already foreclosed a significant amount of the tied market from any competition and will, if left unchecked, drive Verax (and eventually bioMerieux) out of the tied market entirely.  *Id.* ¶¶ 245–256.

## III.    VERAX HAS ADEQUATELY PLED A CLAIM UNDER MASS. GEN. LAWS SECTION 93A.

Verax's well-pled antitrust claims also constitute "unfair method[s] of competition" and "unfair or deceptive act[s] or practice[s]" sufficient to state a Section 93A claim under Massachusetts law. But even if that were not true, Verax has alleged other unfair and deceptive acts by ARC in the form of maliciously misleading statements made to the public and to Verax's customers about Verax and PGD*prime*, including objective lies. Compl. ¶¶ 122–130, 136.

The challenged statements are sufficient under Section 93A because they have "the capacity to mislead consumers, acting reasonably under the circumstances, to act differently than they otherwise would have acted" and are therefore deceptive. *Hanrahran v. Specialized Loan Serv., LLC*, 54 F. Supp. 3d 149, 154 (D. Mass. 2014). They are "unfair" because they are "within at least the penumbra of some common-law, statutory, or other established concept of unfairness," they are "immoral, unethical, or unscrupulous," and they substantially injured Verax as a competitor. *Id.*

ARC also argues that its misconduct did not occur "primarily and substantially within" Massachusetts. Mot. at 20. While ARC correctly references the "center of gravity" test, it omits the test's factors: "(1) where the alleged conduct took place, (2) where the plaintiff received and acted upon the statements, and (3) where the plaintiff's losses were suffered." *Bradley v. Dean Witter Realty, Inc.*, 967 F. Supp. 19, 29–30 (D. Mass. 1997).

The second and third factors undeniably occurred within Massachusetts, where Verax is located, learned of and acted upon ARC's unlawful statements, and suffered harm. In itself, this satisfies the "primarily and substantially within" requirement, and it is sufficient to distinguish the present case from two cited by ARC, where the Plaintiff was not a Massachusetts citizen. *Kuwaiti Danish Comput. Co. v. Digit. Equip. Corp.*, 781 N.E.2d 787 (Mass. 2003) (Kuwaiti Plaintiff); *Sonoran Scanners, Inc. v. Perkinelmer, Inc.*, 585 F.3d 535 (1st Cir. 2009) (Arizona Plaintiff). It bears emphasis that Section 93A was enacted specifically to protect Massachusetts competitors like Verax from unfair and deceptive acts. *See In re Pharm. Industry Average Wholesale Price Litig.*, 582 F.3d 156, 194 (1st Cir. 2009).

It is not yet known which way the first factor leans. ARC has a substantial presence in Massachusetts, including a regional headquarters, and the Complaint does not allege—because

Verax does not yet know—from which office ARC issued its tying policy or its deceptive and defamatory statements. Verax needs discovery to determine this, which is yet another reason to delay resolution of the Section 93A claim until or after summary judgment. Notably, that is what three of the four cases ARC cites in its motion did.

ARC's Motion focuses on where hospitals received ARC's deceptive statements. Mot. at 20. That is not a factor in the center of gravity test. Nor is the location of the hospitals relevant here because ARC's purpose in making the statements (and engaging in the anticompetitive conduct) was to drive Verax out of business. Thus, the wrongful conduct was targeted squarely at Massachusetts and was specifically intended to cause losses and harm in the Commonwealth. Unlike in *Fishman Transfucers, Inc. v. Paul*, 684 F.3d 187, 197 (1st Cir. 2012), the "significant contacts of the competing jurisdictions" here are not "approximately in the balance." *Id.* at 197. Instead, ARC's wrongdoing was focused directly on Verax in Massachusetts. And if, after discovery, the Court is not convinced ARC's misconduct occurred substantially within Massachusetts, this can be remedied by creating a Massachusetts submarket, rather than dismissing the claim entirely.

## IV.    VERAX HAS ADEQUATELY PLEADED TORTIOUS INTERFERENCE.

ARC's only objection to Verax's tortious interference claim is that Verax did not name its lost customers. Mot. at 19. Naming lost customers is not a pleading requirement for this claim, and neither of the cases ARC cites states otherwise. *See Vranos v. Skinner*, 930 N.E.2d 156, 165 (Mass. App. Ct. 2010); *Sensitech Inc. v. Limestone FZE*, 548 F. Supp. 3d 244, 258 (D. Mass. 2021).

To the contrary, *Sensitech* holds that the Plaintiff must simply identify the "opportunity that was lost," which Verax has done by explaining that it lost hospital customers when ARC spread lies about PGD*prime* and also required hospitals to buy ARC's own PRT service instead. Verax has clearly and precisely defined the set of customers it lost, even if it did not name each

one individually. Thus, ARC is on notice of the grounds on which Verax's claim rests for purposes of Rule 8, and the customers ARC has diverted to itself are well within ARC's own knowledge. Verax's pleading is sufficient.

**V.    VERAX'S DEFAMATION CLAIM IS WELL PLEADED.**

ARC seeks dismissal of Verax's defamation claim by citing *HipSaver, Inc. v. Kiel*, 984 N.E.2d 755 (Mass. 2013), which merely holds that some defamation claims are more properly brought as commercial disparagement claims. *Id.* at 762 n.6. Even if that were true here, the proper time to make that determination would be after discovery, and the proper remedy would be to recast Verax's defamation claim as a commercial disparagement claim, rather than dismiss it entirely.

<u>**CONCLUSION**</u>

For the reasons stated, the Court should deny ARC's Motion in its entirety. If the Court finds that any of Verax's claims are not well-pleaded, Verax respectfully requests that dismissal of those claims be made without prejudice and with leave to amend to correct the deficiency.

Dated: May 22, 2023                                    Respectfully submitted,

                                            /s/ *Benjamin M. Stoll*
                                            Benjamin M. Stoll (admitted *pro hac vice*)
                                            bstoll@carltonfields.com
                                            Scott Abeles (admitted *pro hac vice*)
                                            sabeles@carltonfields.com
                                            CARLTON FIELDS, P.A.
                                            Suite 400 West
                                            1025 Thomas Jefferson Street, NW
                                            Washington, DC 20007
                                            Telephone: (202) 965-8100

Elizabeth K. Keeley (Bar ID #669311)
keeley@buttersbrazilian.com
BUTTERS BRAZILIAN LLP
699 Boylston Street, 12th Floor
Boston, Massachusetts 02116
Telephone: (617) 367-2600

*Attorneys for Plaintiff Verax Biomedical Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 22nd day of May, 2023, I electronically filed the foregoing with the Clerk of the Court using CM/ECF, which in turn will automatically generate a Notice of Electronic Filing to all parties in the case who are registered users of the CM/ECF system.

/s/ *Benjamin M. Stoll*
Benjamin M. Stoll