### UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

———————————————————————————)
VERAX BIOMEDICAL INC.,          )
                        )
              Plaintiff,   )
                        )      Civil Action
v.                        )      No. 23-10335
                        )
AMERICAN NATIONAL RED CROSS,  )
                        )
              Defendant.   )
———————————————————————————)

**MEMORANDUM AND ORDER**

January 19, 2024

Saris, D.J.

**INTRODUCTION**

Defendant American National Red Cross ("ARC") is the largest supplier of blood platelets in the United States. Platelets are used to treat patients with cancer, blood disorders, critical injuries, and major surgeries. But platelets are susceptible to bacterial contamination, which can cause serious side effects in transfusion recipients. In the past, ARC sold platelets to hospitals, which then separately employed services to mitigate the risk of platelets becoming infected ("mitigation services"). The United States Food and Drug Administration ("FDA") has endorsed the safety and effectiveness of multiple mitigation services. Plaintiff Verax Biomedical Inc. ("Verax") manufactures one such

mitigation service, a test called PGDprime[1] that detects bacterial growth.

In July 2020, ARC announced its plan to pretreat all platelets it sold using Cerus Corporation's INTERCEPT Blood System, an FDA-approved pathogen reduction treatment. Verax's PGDprime can be used with other mitigation services, but not with INTERCEPT. Verax now sues ARC for allegedly leveraging its power in the market for platelets to monopolize the market for mitigation services, in violation of the Sherman Act (Counts I-III). Verax also alleges that ARC made false and disparaging statements about PGDprime to Verax's customers, in violation of state law (Counts IV-VI). ARC moves to dismiss all counts pursuant to Fed. R. Civ. P. 12(b)(6). After a hearing, the Court **ALLOWS IN PART** and **DENIES IN PART** ARC's motion (Dkt. 18).

## BACKGROUND

Drawing all inferences in favor of Verax, the Court accepts the following factual allegations from the complaint as true.

## I.   Blood Platelets

Platelets are "cell fragments in blood that bind together to form clots, which stop bleeding and repair damaged blood vessels." Dkt. 1 at 5. The human body naturally produces its own platelets, but some patients "need recurring platelet transfusions because

---

[1] Stylized as "PGD*prime*." See, e.g., Dkt. 1 at 4.

their illnesses prevent or reduce the formation of platelets[,] or degrade the effectiveness" of the platelets. Id. at 6. Hospitals purchase platelet "doses" -- bags each containing enough platelets for a single transfusion -- from "blood centers" that collect and process platelets from unpaid volunteers. Id.

The national market for platelets is "severely supply constrained." Id. at 7. This is partly because extracting a donor's platelets is more intensive than collecting other blood products. Drawing platelets from a single donor takes around three hours and yields only one to three doses. Platelets are scarce also because they are susceptible to bacterial contamination that renders them unsafe for transfusion. This gives them a short shelf-life once harvested. Moreover, the onset of the COVID-19 pandemic led to a ten-percent decline in platelet donations. ARC has called the current shortage of platelets and other blood products a "national blood crisis." Id.

## II.  **Bad Blood**

Because platelets are prone to bacterial contamination, FDA regulations require "[b]lood collection establishments and transfusion services [to] assure that the risk of bacterial contamination of platelets is adequately controlled using FDA approved or cleared devices or other adequate and appropriate methods found acceptable for this purpose by FDA." 21 C.F.R. § 606.145(a) (2015).  In  September  2019,  the  FDA  published

nonbinding guidance listing mitigation services compliant with 21 C.F.R. § 606.145(a). <u>See</u> U.S. Food & Drug Admin., Bacterial Risk Control Strategies for Blood Collection Establishments and Transfusion Services to Enhance the Safety and Availability of Platelets for Transfusion: Guidance for Industry (2019) ("2019 Guidance"). The 2019 Guidance recommends mitigation services including Pathogen Reduction Treatment ("PRT"), which is a chemical and light treatment that inhibits bacterial growth, and Large Volume Delayed Sampling ("LVDS"), Primary Culture, and Rapid Secondary Testing, which are bacterial testing protocols. <u>Id.</u> at 5-8. Notably, the FDA endorses PRT and LVDS as "single-step strateg[ies]," meaning that applying either one on its own satisfies the FDA's regulations and renders platelets safe for transfusion within a certain timeframe. <u>Id.</u> at 5. By contrast, the 2019 Guidance lists Rapid Secondary Testing as half of a "two-step strategy," meaning that it needs to be used in conjunction with LVDS or Primary Culture to render platelets safe and FDA-compliant. The FDA does not endorse using Rapid Secondary Testing together with PRT. <u>See generally</u> <u>id.</u> at 5-8.

In December 2020, the FDA updated the 2019 Guidance to extend the deadline for implementing its recommendations until October 2021. <u>See</u> U.S. Food & Drug Admin., Bacterial Risk Control Strategies for Blood Collection Establishments and Transfusion Services to Enhance the Safety and Availability of Platelets for

Transfusion: Guidance for Industry (2020) ("2020 Guidance"). "The FDA has expressed no preference" among its recommended mitigation services. Dkt. 1 at 9. Nevertheless, mitigation services differ in price and in their effects on platelet quality, platelet shelf-life, "dose, availability[,] and other factors that could affect clinical utility." Id. at 10; 2020 Guidance at 5-8.

III. **Parties**

Verax is a corporation with its principal place of business in Marlborough, MA. Verax develops, validates, and commercializes FDA-cleared tests for detecting bacterial growth in platelets. Verax's products include PGDprime, a Rapid Secondary Test that it sells to hospitals. PGDprime "takes only three minutes to perform," "generates results in about thirty minutes," "uses only a nominal sample of each platelet dose," "has no adverse impact on platelet quality or efficacy," results in platelets with a seven-day shelf-life, and costs only $25 per dose. Dkt. 1 at 12-13.

ARC is a federally chartered nonprofit corporation with its principal place of business in Washington, D.C. It was founded in 1881, reincorporated in 1893, and given its first federal charter in 1900. Am. Nat'l Red Cross v. S.G., 505 U.S. 247, 250 (1992). By statute, ARC is responsible for "provid[ing] volunteer aid in time of war to the sick and wounded of the Armed Forces" pursuant to the United States's obligations under the Geneva Convention and other treaties. 36 U.S.C. § 300102(1). It is also tasked with

"carry[ing] out a system of national and international relief in time of peace, and . . . apply[ing] that system in mitigating the suffering caused by . . . great national calamities." Id. § 300102(4). Among other activities, ARC "collects free donated platelets at its blood centers" and sells those platelets to hospitals across the country. Dkt. 1 at 7. ARC is "the largest supplier of platelets in the United States," accounting for "more than 40% of all platelets sold" in the country. Id. It is "the sole supplier of platelets to many hospitals and in some regions in the United States." Id.

In 2007, Congress added language to ARC's statutory charter describing it as "a Federally chartered instrumentality of the United States." See The American National Red Cross Governance Modernization Act of 2007, Pub. L. No. 110-26, § 3(1), 121 Stat. 103 (2007) (codified at 36 U.S.C. § 300101(a)) ("Modernization Act"). In the Modernization Act, which amended the charter, Congress stated that ARC "is and will remain a Federally chartered instrumentality" and that ARC has "the rights and obligations consistent with that status." Id. §§ 2(b)(4)-(5). Since 1905, ARC's charter has allowed it to "sue and be sued." 36 U.S.C. § 300105(a)(5); see also 36 U.S.C. § 2 (1905).

## IV.   **ARC's Policy Change**

Prior to July 2020, ARC sold both platelets treated with PRT and so-called "untreated" platelets "that had been tested with

6

either a Primary Culture or LVDS" but not treated with PRT. Dkt. 1 at 13. ARC's untreated platelets were "compatible with multiple different bacteria mitigation services," including Verax's less expensive PGDprime, so hospitals buying platelets from ARC could choose which mitigation services to use and from whom to purchase them. Id.

In July 2020, ARC announced plans to stop selling untreated platelets and to perform PRT on all platelets prior to sale. ARC entered an exclusive dealing contract with Cerus Corporation ("Cerus"), which produces the INTERCEPT Blood System, the only FDA-approved PRT technology for platelets. Dkt. 1 at 10, 16. Per their contract, ARC has agreed to sell only platelets treated with INTERCEPT to hospitals. ARC has indicated that it will fully transition to selling only platelets treated with INTERCEPT by some point in 2023.

PRT technologies like INTERCEPT "result[] in the loss of approximately 10-15% of the platelet product," "degrade[] platelets, rendering them less efficacious," result in platelets with only a five-day shelf-life, and are more expensive than other mitigation services. Id. at 10-11, 14 (noting that ARC's INTERCEPT-treated platelets will cost hospitals $150 per dose). PRT "has been associated with two transfusion-related deaths from sepsis caused by bacterial contamination" that the treatment did not eliminate. Id. at 11. According to Verax, ARC's plan will make it

"impossible" for hospitals to purchase mitigation services from Verax, as the FDA has not endorsed pairing Rapid Secondary Tests like PGDprime with PRT technologies like INTERCEPT. Id. at 14. Verax alleges that ARC's policy will harm patients by decreasing platelet quality and increasing safety risks, and harm hospitals by raising costs and eliminating choice.

## V.    ARC's Statements about Verax

Verax claims that over the course of several years, ARC knowingly made a series of false or misleading statements about PGDprime to Verax's customers. For example, in July 2020, ARC sent hospitals that purchased PGDprime a document titled "The American Red Cross Approach to Platelet Safety, Implementation Plan for Bacterial Control Strategies, Frequently Asked Questions" ("FAQ"). Dkt. 1 at 17. ARC also published the FAQ on its website. In it, ARC asserted first that "secondary, point-of-issue . . . bacterial testing (e.g., the Verax PGD test) involves a new testing regimen for most hospitals, is time consuming to perform and involves significant cost both in materials and staff time." Id. Second, it declared that "[PRT] platelets offer the best and most efficacious approach to ensuring platelet safety while sustaining the blood supply." Id. at 18. Third, it stated that providing platelets compatible with Verax's test would "add additional costs and inventory management complexity[,] potentially compromising the platelet supply." Id. Fourth, it explained that ARC decided to

sell only PRT-treated platelets to "protect the safety and availability of the platelet supply." Id. Fifth, it expressed that PRT "contributes to a stronger blood supply by qualifying more units for transfusion through the elimination of false positives associated with . . . rapid testing." Id. at 19. And sixth, it touted that PRT-treated platelets "offer substantial patient safety benefits and improved inventory simplification." Id.

ARC also discussed Verax in its Winter 2020 newsletter, which ARC published online and distributed to hospitals including Verax's customers. The newsletter stated that "[p]erformance of secondary . . . rapid testing (e.g., Verax testing) adds additional labor, cost to the transfusion service, and reduces the final product volume." Id. at 20. Finally, between 2015 and October 2021, ARC told Verax's customers that PGDprime could not extend the shelf-life of untreated platelets sold by ARC from five to seven days. During the same period, ARC tried to convince Verax's customers to switch from buying untreated platelets to buying PRT-treated platelets by stating that "PRT broadly qualifies for Medicare/Medicaid reimbursement, implying that PGDprime did not," even though "both PRT and PGDprime qualify for reimbursement under the exact same circumstances." Id. at 21.

## VI. **Procedural History**

Verax filed this suit against ARC on February 14, 2023. See Dkt. 1. It raised three counts under the Sherman Act: tying

(Count I), exclusive dealing (Count II), and attempted monopolization (Count III). It also raised three counts under state law: unfair methods of competition and unfair and deceptive practices (Count IV), defamation (Count V), and tortious interference with contractual relations (Count VI). ARC moved to dismiss all counts on April 17, 2023. See Dkt. 18. On August 4, 2023, the United States filed a statement of interest under 28 U.S.C. § 517, arguing that contrary to ARC's assertions, ARC can be sued under the Sherman Act. See Dkt. 34. The Court held a hearing on the motion on September 28, 2023. See Dkt. 39.

## LEGAL STANDARD

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court accepts the well-pleaded allegations in the complaint as true and construes reasonable inferences in the plaintiff's favor. Breiding v. Eversource Energy, 939 F.3d 47, 49 (1st Cir. 2019). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "Plausible, of course, means something more than merely possible, and gauging a pleaded situation's plausibility is a context-specific job that compels [the court] to draw on [its] judicial experience and common

sense." Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012) (cleaned up).

## DISCUSSION

## I.   Antitrust Claims (Counts I-III)

Verax brings three claims under the Sherman Act: tying (Count I), exclusive dealing (Count II), and attempted monopolization (Count III). The Sherman Act prohibits "contract[s], combination[s] . . . or conspirac[ies], in restraint of trade or commerce," as well as "attempt[s] to monopolize . . . any part of" interstate commerce. 15 U.S.C. §§ 1-2. As a preliminary matter, parties dispute whether ARC is subject to liability under the Sherman Act at all. To determine whether the Sherman Act reaches ARC, the Court applies the two-step analysis articulated in FDIC v. Meyer, 510 U.S. 471, 484 (1994). The Court must first ask whether there is a waiver of sovereign immunity for actions against ARC. U.S. Postal Serv. v. Flamingo Indus. (USA) Ltd., 540 U.S. 736, 743 (2004). The second question is "whether the substantive prohibitions of the Sherman Act apply" to ARC. Id.

The answer to the first question is yes. Since 1905, ARC's statutory charter has stated that ARC may "sue and be sued in courts of law and equity, State or Federal, within the jurisdiction of the United States." 36 U.S.C. § 300105(a)(5); see 36 U.S.C § 2 (1905). This language in the charter constitutes a waiver of ARC's sovereign immunity. See Flamingo, 540 U.S. at 743. But "[a]n

absence of immunity does not result in liability if the substantive law in question is not intended to reach the federal entity." Id. at 744. Thus, the next question is whether "the substantive antitrust liability defined by the statute extends to" ARC. Id.

As to the second question, the Sherman Act "imposes liability on any 'person,'" which includes "corporations and associations existing under or authorized by the laws of . . . the United States." Flamingo, 540 U.S. at 744-45 (citing 15 U.S.C. § 7). "[T]he United States is not an antitrust 'person,' in particular not a person who can be an antitrust defendant." Id. at 745. "The remaining question, then, is whether for purposes of the antitrust laws," ARC "is a person separate from the United States itself." Id. at 746. ARC argues that as a federal instrumentality, it is not. Both Verax and the United States argue that it is.

The Supreme Court's decision in United States Postal Service v. Flamingo Industries (USA) Ltd. gives a birds-eye view of the legal framework. Id. At issue in Flamingo was whether the United States Postal Service ("USPS") is an antitrust "person" separate from the United States. Id. at 746. Analyzing both the "form and function" of USPS, the Court held that it is "part of the Government of the United States and so is not controlled by the antitrust laws." Id. at 748.

As to form, the Court focused on USPS's enabling statute, which describes it as "an independent establishment of the

executive branch of the Government of the United States." Id. at 740 (citing 39 U.S.C. § 201). This "statutory designation," the Court held, is "not consistent with the idea that [USPS] is an entity existing outside the Government." Id. at 746. Had Congress created USPS as a corporation, the Court suggested it "would have [had] to ask whether the Sherman Act's definition" of a "person," which includes corporations, covered USPS. Id. But the Court did not decide whether or under what circumstances a federally chartered corporation would be an antitrust person separate from the United States. Id.

As to function, the Court noted that USPS has "different goals, obligations, and powers from private corporations." Id. at 747. The Court stated that "[t]he most important difference" between USPS and private corporations is that USPS "does not seek profits, but only to break even, . . . which is consistent with its public character." Id. USPS also fulfills public obligations "including the provision of universal mail delivery, the provision of free mail delivery to certain classes of persons, and . . . increased public responsibilities related to national security." Id. (internal citation omitted). Finally, the Court noted that USPS exercises "many powers more characteristic of Government than of private enterprise," including "the power of eminent domain, and the power to conclude international postal agreements," which

also supported treating USPS as a public rather than private entity under the antitrust laws. Id.

Two years after Flamingo, the Sixth Circuit considered whether the Tennessee Valley Authority ("TVA"), a corporation created by federal statute, is subject to liability under the Sherman Act. See McCarthy v. Middle Tenn. Elec. Membership Corp., 466 F.3d 399, 412-14 (6th Cir. 2006) (citing 16 U.S.C. § 831). Noting it was not an "easy question," the Sixth Circuit held that TVA is a separate antitrust person from the federal government. Id. at 414 (quoting Flamingo, 540 U.S. at 746). The court reasoned that "the key distinction presented by Flamingo, that the TVA is a federal corporation unlike the Postal Service, supports the conclusion that the TVA is not immune from antitrust liability" even though it has "certain public characteristics." Id.

With Flamingo as a guide, this Court concludes that in both form and function, ARC is not an antitrust person. The issue is close.

### A. Form

First, ARC's enabling statute demonstrates a congressional intent to treat it as an instrumentality of the federal government. Three years after Flamingo, Congress codified ARC's status as "a Federally chartered instrumentality of the United States" and affirmed that it "has the rights and obligations consistent with that status." Modernization Act §§ 2(b)(4)-(5) (codified at 36

14

U.S.C. § 300101(a)). One of those "rights" of an instrumentality of the United States is immunity from antitrust suit. See Sea-Land Serv., Inc. v. Alaska R.R., 659 F.2d 243, 244 (D.C. Cir. 1981) (Ginsburg, J.) ("Congress did not place the United States or its instrumentalities under the governance of the Sherman Act."). This Court treats Congress' "choice of words [as] more informed than unconsidered," see Flamingo, 540 U.S. at 746, especially given that Congress has also "create[d] entities and confer[red] upon them non-governmental status" when it has intended to do so, Baker v. Runyon, 114 F.3d 668, 671 (7th Cir. 1997); see, e.g., 47 U.S.C. § 396(b) (creating the "Corporation for Public Broadcasting" but stating it "will not be an agency or establishment of the United States Government"). "The mere fact that Congress even had to explicitly waive [ARC's] sovereign immunity . . . in the first place" supports the argument that Congress views ARC as an arm of the sovereign. See Robinson v. Runyon, 149 F.3d 507, 516-17 (6th Cir. 1998); Baker, 114 F.3d at 671. "[O]therwise such a waiver would be unnecessary." Robinson, 149 F.3d at 517.

Verax contends that ARC's status as a federal corporation alone places it within the Sherman Act's ambit. The caselaw does not support that ironclad rule. For example, the Sixth Circuit held that Federal Reserve Banks, which are federal corporations, are not separate antitrust persons from the United States government because of the "role of the Federal Reserve System as

manager of the fiscal affairs of the federal government and the money supply of the nation." Jet Courier Servs., Inc. v. Fed. Rsrv. Bank, 713 F.2d 1221, 1228 (6th Cir. 1983). Corporate form is not dispositive of antitrust personhood; the corporation's function matters too.

In its statement of interest, the United States insists that ARC is a federal instrumentality only for the limited purpose of immunity from state taxation. In Department of Employment v. United States, the Supreme Court held that "federal instrumentalities like the Red Cross" are "exempt from state taxation." 385 U.S. 355, 361 (1966). The United States argues that Congress expressly refers to Department of Employment in the Modernization Act's prefatory language:

> The United States Supreme Court held The American National Red Cross to be an instrumentality of the United States, and it is in the national interest that the Congressional Charter confirm that status and that any changes to the Congressional Charter do not affect the rights and obligations of The American National Red Cross to carry out its purposes.

Modernization Act § 2(a)(7) (emphasis added). According to the United States, Congress's reference to Department of Employment evinces an intent to codify only ARC's tax immunity, not full instrumentality status. But the United States overlooks the rest of the Modernization Act. In the same section cited by the United States, Congress states twice without qualification that ARC "is and will remain a Federally chartered instrumentality of the United

16

States" with "the rights and obligations consistent with that status." Modernization Act §§ 2(b)(4)-(5). As noted above, one such "right" is immunity from antitrust suit. Sea-Land, 659 F.2d at 244. If Congress intended to limit ARC's instrumentality status, it would have stated so explicitly in ARC's amended charter. Compare 12 U.S.C. §§ 1716b, 1723a(c)(2) (creating the Federal National Mortgage Association as a "[g]overnment-sponsored private corporation" and exempting it "from all taxation now or hereafter imposed by any [s]tate"), with 36 U.S.C. § 300101(a) (providing that ARC is "a Federally chartered instrumentality of the United States"). Although this issue is less than clear, the language of ARC's statutory charter, which does not contain a limitation, controls.

The United States also maintains that ARC is a separate antitrust person because "the United States does not own, control, or supervise the ARC." Dkt. 34 at 6. However, governmental ownership and control are not dispositive of personhood under the Sherman Act. See Flamingo, 540 U.S. at 747. The decisions cited by the United States are inapposite because they involve different claims with different legal standards. See, e.g., Dep't of Transp. v. Ass'n of Am. R.R., 575 U.S. 43, 53 (2015) (holding that under the Due Process Clause, Amtrak is not an "autonomous private enterprise" due to its "unique features and its significant ties to the Government"); Forsham v. Harris, 445 U.S. 169, 186 (1980)

(holding that a federal grantee was not an agency under the Freedom of Information Act). Moreover, the sole antitrust case the United States cites in support treated governmental ownership as "immaterial" to personhood analysis. See Jet Courier Servs., 713 F.2d at 1228 (focusing on public goals and responsibilities).

**B.   Function**

Second, ARC's "goals, obligations, and powers" support treating ARC as a public rather than a private entity. Flamingo, 540 U.S. at 747. In Flamingo, the Court stated that the "most important difference" between USPS and private enterprises was that USPS "does not seek profits." Id. ARC is a nonprofit corporation. Moreover, ARC's charter requires it to fulfill a variety of public functions, see id., including effectuating treaty obligations and coordinating domestic and international aid both during peacetime and during war or emergency, 36 U.S.C. § 300102. It is true that ARC's enabling statute does not endow it with "powers more characteristic of Government than of private enterprise" such as eminent domain or the ability to conclude international agreements. Flamingo, 540 U.S. at 747; see 36 U.S.C. § 300105 (listing ARC's powers). Even so, on balance, ARC's public attributes outweigh its private ones for this analysis. Cf. Robinson, 149 F.3d at 516 ("Although the Postal Service has 'commercial like' operation, it functions as part of the federal government."); Baker, 114 F.3d at 670 ("The Postal Service may be

run in a manner <u>similar</u> to a private commercial entity, but it is not a private commercial entity.").

The United States contends that because ARC's goals require it to work independently of the government, it is a separate antitrust person. <u>See</u> Dkt. 34 at 11 (citing 36 U.S.C. § 300102(3)). In <u>Flamingo</u>, USPS's statutory status as an "<u>independent</u> <u>establishment</u> of the executive branch" weighed in <u>favor</u> of treating it as one with the federal government, not <u>against</u> doing so. <u>See</u> 540 U.S. at 740 (emphasis added). Finally, the United States asserts that because "[f]ederal courts have repeatedly concluded that . . . the ARC is a corporate 'person' separate from the United States itself," the same should follow here. Dkt. 34 at 5. But the decisions the United States relies on predate the 2007 amendment to ARC's statutory charter, and again, they discuss ARC's governmental status under distinct legal regimes and standards. <u>See, e.g.</u>, <u>Hall v. Am. Nat'l Red Cross</u>, 86 F.3d 919, 922 (9th Cir. 1996) (Religious Freedom Restoration Act); <u>Marcella v. Brandywine Hosp.</u>, 47 F.3d 618, 624 (3d Cir. 1995) (trial by jury); <u>Irwin Mem'l Blood Bank of the S.F. Med. Soc'y</u>, 640 F.2d 1051, 1057 (9th Cir. 1981) (Freedom of Information Act); <u>Rayzor v. United States</u>, 937 F. Supp. 115, 119 (D.P.R. 1996) (Federal Tort Claims Act).

Because ARC is an instrumentality of the United States, it is not a "person" separate from the United States under the Sherman Act. Verax's antitrust claims are dismissed.

## II. **Defamation (Count V)**

Verax also sues ARC for defamation. To state a claim for defamation, Verax must show that ARC "published a false statement about [it] to a third party that . . . caused [it] economic loss or was of the type that is actionable without proof of economic loss." Phelan v. May Dep't Stores Co., 819 N.E.2d 550, 553 (Mass. 2004). Verax alleges that ARC defamed it by telling Verax's customers "that Verax's PGDprime test is less safe, more expensive, and less effective than" Cerus's INTERCEPT technology, which caused Verax "substantial economic harm in the form of lost sales and revenues." Dkt. 1 at 45-46. ARC argues that at most, it disparaged PGDprime, not Verax.

"A threshold issue in a defamation action, whether a communication is reasonably susceptible of a defamatory meaning, is a question of law for the court." Phelan, 819 N.E.2d at 554. The Court applies "an objective test . . . inquir[ing] into a reasonable recipient's understanding of the words rather than the speaker's intent." New Eng. Tractor-Trailer Training of Conn., Inc. v. Globe Newspaper Co., 480 N.E.2d 1005, 1010 (Mass. 1985). A disparaging statement about the plaintiff's product may be defamatory to the plaintiff when its "imputation fairly implied is that the plaintiff is dishonest or lacking in integrity, or that he is deliberately perpetuating a fraud upon the public by selling a product which he knows to be defective." See HipSaver, Inc. v.

Kiel, 984 N.E.2d 755, 762 n.6 (Mass. 2013) (quoting W.L. Prosser
& W.P. Keeton, Torts § 128, at 965 (5th ed. 1984)). Here, Verax's
allegations fall short of that bar.

Verax alleges that ARC told its customers, among other things,
that PGDprime "is time consuming to perform and involves
significant cost both in materials and staff time," Dkt. 1 at 17,
that using PGDprime would "add additional costs and inventory
management complexity[,] potentially compromising the platelet
supply," id. at 18; see also id. at 21, that PRT "contributes to
a stronger blood supply by qualifying more units for transfusion
through the elimination of false positives associated with . . .
rapid testing," id. at 19, and that PGDprime could not extend the
shelf-life of untreated platelets sold by ARC from five to seven
days, id. at 21. Regardless of their truth or falsity, these
statements are criticisms of PGDprime, not of Verax, and could not
reasonably be interpreted as stating or implying that Verax is
"dishonest or lacking in integrity." HipSaver, 984 N.E.2d at 762
n.6 ("[C]ourts generally are reluctant to impute a lack of
integrity to a corporation merely from a criticism of its product."
(cleaned up) (quoting Dairy Stores, Inc. v. Sentinel Publ'g Co.,
516 A.2d 220, 224 (N.J. 1986))). Because Verax has not alleged

that ARC's statements about PGDprime objectively disparaged its integrity, it fails to state a claim for defamation.

### III. __Tortious Interference with Contractual Relations (Count VI)__

Verax has alleged that ARC tortiously interfered with Verax's contracts with hospitals to sell PGDprime. Dkt. 1 at 46. To state a claim for tortious interference with a contract, Verax must show that "(1) [it] had a contract with a third party; (2) [ARC] knowingly induced the third party to break that contract; (3) [ARC]'s interference, in addition to being intentional, was improper in motive or means; and (4) [Verax] was harmed by [ARC]'s actions." Psy-Ed Corp. v. Klein, 947 N.E.2d 520, 536 (Mass. 2011). ARC alleges that Verax has not "identif[ied] a specific contract that [ARC] allegedly interfered with, or a specific Verax customer" that ARC induced to breach a contract with Verax. Dkt. 19 at 25. Verax responds that it has "clearly and precisely defined the set of customers it lost, even if it did not name each one individually." Dkt. 23 at 24-25.

Verax has alleged that it had contractual relationships with hospitals that purchased non-PRT platelets from ARC and employed PGDprime as their preferred mitigation service. See Dkt. 1 at 13, 36. It has also alleged that ARC communicated with its customers intending "to convince [them] to switch to [ARC's] PRT service," which would require customers to stop using PGDprime. Id. at 21. Although Verax does not state specific customers it lost, it

plausibly alleges that it lost a "substantial" share of its Massachusetts customers. See, e.g., id. at 41. These facts are sufficient to show that ARC interfered with Verax's business relationships. Moreover, Verax has alleged that ARC knew its communications to Verax's customers about PGDprime were false or misleading. Id. at 17-21. Thus, Verax has pleaded improper means. Finally, Verax also claims it "lost sales and revenues," which is sufficient to show damages at this stage. Id. at 46.

## IV.   Massachusetts Consumer Protection Law (Count IV)

Verax also brings a claim under Mass. Gen. Laws ch. 93A. Verax alleges that "ARC has engaged . . . in unfair methods of competition and unfair and deceptive practices" by:

> [T]ying its sales of platelets to sales of its platelet bacteria mitigation services, by attempting to monopolize the market for platelet bacteria mitigation services, by coercing its most reliant platelet customers into exclusive dealing arrangements for its platelet bacteria mitigation services, by defaming Verax, by repeatedly issuing false and misleading statements about its and Verax's platelet bacteria mitigation services, and by tort[i]ously interfering with Verax's customer relationships.

Dkt. 1 at 44. ARC argues that insofar as Verax's Chapter 93A claim is derivative of its antitrust, defamation, and tortious interference claims, if those claims are dismissed, this one must be as well. See Skehel v. DePaulis, No. 13-11202, 2017 WL 2380164, at *2 (D. Mass. June 1, 2017) ("Chapter 93A claims [that] are derivative of . . . unsuccessful claims . . . cannot succeed.").

Additionally, ARC contends that Verax has not alleged any misconduct occurred "primarily and substantially within" Massachusetts as required under Chapter 93A. Dkt. 19 at 26 (quoting Mass. Gen. Laws ch. 93A, § 11). Verax responds that its Chapter 93A claim is not wholly derivative of its other claims, and that the "center of gravity" of its allegations is Massachusetts. Dkt. 23 at 23 (quoting Bradley v. Dean Witter Realty, Inc., 967 F. Supp. 19, 29-30 (D. Mass. 1997)).

Even if this Court accepted ARC's argument about derivative claims, as noted above, Verax has successfully pleaded tortious interference, so a Chapter 93A claim based on the same underlying conduct may proceed. Verax has also alleged that ARC violated Chapter 93A "by repeatedly issuing false and misleading statements about its and Verax's platelet bacteria mitigation services," which is not derivative of any other claim. Dkt. 1 at 44. ARC does not dispute that issuing misleading statements would constitute an unfair and deceptive trade practice under Chapter 93A but argues that Verax has not satisfied Chapter 93A's geographic requirements.

Chapter 93A only allows for suit when "the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within" Massachusetts. Mass. Gen. Laws ch. 93A, § 11. Massachusetts courts consider three factors in determining whether challenged acts occurred "primarily

and substantially in Massachusetts": "(1) where the alleged conduct took place, (2) where the plaintiff received and acted upon the statements, and (3) where the plaintiff's losses were suffered." Bradley, 967 F. Supp. at 29 (citing Bushkin Assocs., Inc. v. Raytheon Co., 473 N.E.2d 662, 672 (Mass. 1985)).

Verax is based in Massachusetts. It claims that ARC "issu[ed] false, defamatory, misleading, and deceptive statements in Massachusetts to Verax's . . . Massachusetts customers." Dkt. 1 at 44 (emphasis added). Verax further alleges that ARC sent the allegedly misleading FAQ and the Winter 2020 newsletter to Verax's customers, which include the Massachusetts hospitals to whom Verax "often" sells PGDprime. Id. at 17, 20. Thus, Verax has sufficiently pleaded that it received ARC's statements and suffered losses in Massachusetts. ARC is not based in Massachusetts and Verax notes that it does not know whether ARC issued its FAQ, newsletter, and other communications from Massachusetts, notwithstanding that it may have directed them to Massachusetts hospitals. See Dkt. 23 at 23-24. Nevertheless, because the other two factors weigh in favor of Verax, this Court holds that the conduct occurred primarily and substantially in Massachusetts.

Because at least some of Verax's Chapter 93A theories are adequately pled, the Court does not dismiss.

## ORDER

For the reasons stated above, ARC's Motion to Dismiss (Dkt. 18) is **ALLOWED IN PART** as to Counts I-III & V, and **DENIED IN PART** as to Counts IV and VI.


SO ORDERED.

/s/ PATTI B. SARIS
Patti B. Saris
United States District Judge