```
 1                 IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF MASSACHUSETTS
 2

 3   VERAX BIOMEDICAL INC.,             )
                                        )
 4                  Plaintiff           )
                                        )
 5              -VS-                     )  CA No. 23-10335-PBS
                                        )  Pages 1 - 67
 6   AMERICAN NATIONAL RED CROSS,       )
                                        )
 7                  Defendant           )

 8

 9                    MOTION HEARING BY VIDEO

10            BEFORE THE HONORABLE PATTI B. SARIS
                  UNITED STATES DISTRICT JUDGE
11

12

13

14

15                              United States District Court
                                1 Courthouse Way
16                              Boston, Massachusetts  02210
                                September 28, 2023, 9:34 a.m.
17

18

19

20

21

22                       LEE A. MARZILLI
                     OFFICIAL COURT REPORTER
23                 United States District Court
                   1 Courthouse Way, Room 7200
24                     Boston, MA  02210
                      leemarz@aol.com
25
```

1    A P P E A R A N C E S:

2        SCOTT MICHAEL ABELES, ESQ. and BENJAMIN M. STOLL, ESQ.,
     Carlton Fields, P.A., 1025 Thomas Jefferson Street,
3    Suite 400 West, Washington, DC, 20007, for the Plaintiff.

4        JENNIFER L. GIORDANO, ESQ., Latham & Watkins LLP,
     555 Eleventh Street, N.W., Suite 1000, Washington, DC,
5    20004, for the Defendant.

6        JOSEPH ADAMSON, ESQ., Department of Justice, Antitrust
     Division, 450 5th Street N.W., Suite 4100, Washington, DC,
7    20530, appearing for the Interested Party, United States of
     America.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2            THE CLERK:  Good morning.
 3            THE COURT:  Good morning.
 4            THE CLERK:  So I have everybody on on both sides,
 5    and I'll call the case.
 6            THE COURT:  Thank you.
 7            THE CLERK:  You're welcome.  The Court calls Civil
 8    Action 23-10335, Verax Biomedical Inc. v. American National
 9    Red Cross.  Could counsel please identify themselves.
10            MR. ABELES:  Scott Abeles from Carlton Fields for
11    Verax, and joining me today, also from Carlton Fields, is
12    Ben Stoll.
13            MS. GIORDANO:  Good morning, your Honor.  Jennifer
14    Giordano from Latham & Watkins on behalf of the defendant,
15    American National Red Cross.
16            MR. ADAMSON:  Good morning, your Honor.  Joseph
17    Adamson from the U.S. Department of Justice representing the
18    United States of America.
19            THE COURT:  Thank you.  Do we have everyone?  All
20    right, so we have two hours for this, and I was trying to
21    think of how we can divide this up in a practical way.  Was
22    the United States planning on arguing?
23            MR. ADAMSON:  If your Honor allows, we would like
24    to speak.  We prepared for that ten minutes, but hopefully
25    it will require less time than that.
```

```
 1              THE COURT:  It strikes me that the arguments fall into
 2     three buckets.  Maybe there are more.  I mean, the first would
 3     be, is the American Red Cross a person?  And we could spend --
 4     each side could maybe have ten minutes apiece?  Does that make
 5     sense?  Then the U.S. can either watch, enjoy, or leave.
 6     That's fine.  Then there's the big buckets of the antitrust
 7     allegations, and then there are the state tort claims.
 8              So have you figured out -- I think it makes sense to
 9     go through those three buckets rather than have each person
10     argue nonstop, but I don't know if you've proposed another
11     agenda.
12              MR. ABELES:  That approach, dealing with personhood
13     first and then the antitrust claims and then the state law
14     claims, sounds like a good approach to us, your Honor.
15              MS. GIORDANO:  Yes, your Honor, that sounds like a
16     good approach to the American Red Cross as well, your Honor.  I
17     confess, I feel that I might need a little bit more than ten
18     minutes to present the argument but not a whole lot more, if
19     that would be okay, on personhood.
20              THE COURT:  Well, how long do you think you'd need?
21              MS. GIORDANO:  Fifteen minutes?
22              THE COURT:  Done.  Easy win.  The other issue is much
23     harder.  So let me just warn you that that essentially means --
24     so basically it's in the vicinity of forty-five minutes for the
25     personhood issue, and then, if I do that, it strikes me that
```

09:37 (line 10)
09:37 (line 20)

1     antitrust may be the hardest in some ways, or at least the most

2     diffuse; and it just may be you'll have to, if we don't finish,

3     end up on your papers in the state tort claims.

4          So let's just try for it.  I mean, I don't know that

5     you can do justice to the antitrust issues in less than fifteen

6     minutes apiece.  My guess is much longer, right?

7          MS. GIORDANO:  I think that we can deal with the

8     antitrust issues in the remaining time that we have, and

9     American Red Cross would be comfortable resting on our papers

09:38 10     on the state law claims if we run out of time, your Honor.

11          MR. ABELES:  We would as well, your Honor.

12          THE COURT:  Okay.  And let me just say, I actually

13     don't think the State Court claims are so easy, some of them.

14     If I really feel the need for a further argument, if I plow my

15     way through these, I may just ask for just a second argument,

16     so maybe I'll see you and you'll have travel expenses, okay?

17     All right.

18          All right, so why don't we start on -- I suppose what

19     we can do -- it's a motion to dismiss, so technically we should

09:39 20     start with the American Red Cross.  And I'll be mean and cut

21     you off in fifteen minutes because otherwise we'll never get

22     through all this.  Okay?

23          MS. GIORDANO:  Fair enough, your Honor.  Thank you so

24     much.

25          THE COURT:  So it's now -- I have roughly 9:40, okay?

1          MS. GIORDANO:  Your Honor, we have a few slides.  I

2     know you have a copy of them in front of you.  Would it be okay

3     if I presented them on the screen now?

4          THE COURT:  Of course.

5          MS. GIORDANO:  Thank you.  I'm going to be starting on

6     Slide 4 for your reference for your hard copy.  Can you see the

7     slides okay?

8          THE COURT:  Yes.

9          MS. GIORDANO:  Okay, thank you.  So good morning, your

09:40 10   Honor.  As I said, I'm Jennifer Giordano, and I represent the

11     Red Cross in this matter, and this personhood argument that

12     we're starting with today is the question of which entities

13     fall within the definition of the statutory term "person" under

14     the Sherman Act?  Because Congress has determined that only

15     persons can be sued under that Act.  And the courts have been

16     called upon to interpret the definition of the term "person" a

17     number of times over the years, and with respect to the issue

18     in this case, all the courts who have considered the question

19     over the last forty years have concluded that the United States

09:40 20   government and its federal instrumentalities are not persons

21     within the meaning of the Sherman Act.

22          I put a sampling of those cases on Slide 4.  These are

23     not all of them, but I just wanted to highlight -- these are

24     all cited in our brief -- that the term "instrumentality,

25     "government instrumentality, instrumentality of the United

1    States," it's basically a term of art in this body of law.

2          And I would note that the Department of Justice itself

3    has said that in fact federal instrumentalities are not persons

4    under the Sherman Act.  This is really an uncontroversial

5    proposition.

6          The two most famous cases that get discussed the most,

7    of course, start with *Sea-Land*, which was the DC Circuit's

8    decision from 1981.  That was a decision written by then

9    Judge Ginsberg when she was sitting on the DC Circuit, and the

09:41 10   DC Circuit concluded that Congress did not place the United

11   States or its instrumentalities under the governance of the

12   Sherman Act.

13         Move forward to 2004 when the Supreme Court took up

14   this question in the *U.S. Postal Service v. Flamingo* case.  At

15   that point in time, Justice Ginsberg was now a sitting member

16   of the Supreme Court, and I'm sure she was delighted to hear

17   that her entire set of colleagues unanimously agreed with her

18   that she had gotten it right in *Sea-Land* and that *Sea-Land* had

19   set forth the correct approach to this "person" question,

09:42 20   holding that the Sherman Act definition of "person" does not

21   include the United States or federal entities, and that meant

22   that the Postal Service was not a person that could be sued

23   under the Sherman Act.

24         This body of law I just described to you about federal

25   instrumentalities, that the principle, the legal principle that

1    federal instrumentalities are not subject to the Sherman Act is

2    a settled issue, but there is sometimes debate about which

3    entities constitute federal instrumentalities when Congress has

4    not formally designated them as such.  And in fact that was

5    really the thrust of the central debate in the *Flamingo* case.

6    The Department of Justice said over and over again that federal

7    instrumentalities are not persons because it was trying to

8    convince the Supreme Court to treat the Postal Service as a

9    functional equivalent of a federal instrumentality, even though

09:43 10    Congress had not formally designated it as such.  Congress had

11    designated the Postal Service as an independent establishment

12    of the Executive Branch.

13         But this instrumentality doctrine is so well-ingrained

14    in the courts that, as I showed you on Slide 4 at the very

15    bottom, the Third Circuit itself characterizes the *Flamingo*

16    case as holding that the Postal Service is a federal

17    instrumentality for antitrust purposes.

18         Fortunately here, we don't have to engage in the

19    debate about what the Red Cross is and whether it should be

09:43 20    treated as a federal instrumentality because Congress has

21    formally designated it as such.

22         So Verax says that the Court should not let the Red

23    Cross escape the antitrust laws just because it does good

24    deeds.  There are a lot of good-deed-doing companies that are

25    subject to the antitrust laws, and that is certainly true, but

1   the Red Cross is fundamentally different than those

2   organizations in a couple of important respects.  The first is

3   that it exists and it is organized pursuant to a statutory

4   charter blessed by Congress right in the United States Code.

5   It's Title 36 of the Code, Section 300101.

6           And importantly for this case, in 2007 Congress,

7   passed by both the House and the Senate, amended the Red

8   Cross's statutory charter to confirm that it is in fact a

9   federally chartered instrumentality of the United States; and

09:44 10   in that Act amending the charter, which is known as the 2007

11   Governance Act, Congress said not once but twice, "Let us be

12   clear that we want the Red Cross to have the rights and

13   obligations consistent with federal instrumentality status."

14   So under the body of law I just described to you, that means

15   the Red Cross is not a person.

16           Now, the reason that Congress has designated the Red

17   Cross as a federally chartered instrumentality of the United

18   States is because Congress has given the Red Cross incredibly

19   important obligations for this country.  We cited these in our

09:45 20   brief, so I won't go over them.  You are all probably familiar

21   with the fact that the Red Cross does a lot of humanitarian

22   work, disaster relief work, but I, for one, was not aware that

23   those obligations actually emanate from a statute that Congress

24   has imposed on the Red Cross to do these things.

25           I want to pause for a moment on the two middle bullets

on Slide 8 because these are things that Congress obligates the
Red Cross to do that may not be as familiar to some of us.  The
first is that Congress has given the Red Cross incredibly
important obligations with respect to our U.S. military, both
our active-duty members, the veterans, and our wounded
soldiers.

Congress has also designated the Red Cross to fulfill
the United States's treaty obligations under things like the
Geneva Convention.  In fact, Congress views the Red Cross's
treaty obligations as so important that it has actually created
an entire subsection of the U.S. Code just for the Red Cross
that is defined as "Treaty Obligation Organization."  It is a
party of one; it's just the Red Cross.

I want to pause just briefly on this treaty issue for
a moment because I know it has come up, both by the Department
of Justice and by Verax, as somehow the Red Sox's treaty
obligations are a reason it is not part of the government.  I
think it was DOJ who even went so far as to say that those
treaties legally require the Red Cross to be structurally
separate from the United States government, and I confess I
have no idea where they're getting that from.  That's just not
true.  The treaties do not require the Red Cross to be
structurally separate from the United States government, and in
fact, it's actually getting things backwards.  The whole reason
that Congress gave the Red Cross its first statutory charter in

1    1900 -- that's the first one -- was because Congress was

2    designating the Red Cross as the United States's representative

3    under the Geneva Convention, and Congress said that's so

4    important, that work is so important for this country that it

5    demands that we bring the Red Cross into the government, create

6    it as a federal entity, and that we bring it under federal

7    government supervision.

8         The Red Cross, of course, as you know from our papers,

9    existed prior to 1900.  Clara Barton famously founded it in

09:47  10    1881.  It was an entity, and Congress said "That thing, that

11    form that Clara Barton found isn't good enough for our

12    purposes.  We need to re-charter it --" that's the word it

13    used -- "recreate it as a federal entity," and that's how this

14    whole thing started.

15         So I think these facts show us that under a

16    straightforth interpretation of the Supreme Court's decision in

17    *Flamingo,* the Red Cross is simply not a person.

18         THE COURT:  So was the Post Office a corporation?

19         MS. GIORDANO:  The Post Office was not a corporation.

09:48  20    It was an independent establishment of the Executive Branch.

21         THE COURT:  So were any of these federal

22    instrumentalities not subject to the various laws, are any of

23    them actual corporations?

24         MS. GIORDANO:  Yes, an important one actually, your

25    Honor, and I will flip to that slide, if I can, if I remember

1    what page number it was.  I think it's 14.  The Federal Reserve

2    Banks, those are designated statutorily as federal corporations

3    and only federal corporations.  They are not statutorily

4    designated as federal instrumentalities.  Yet the Sixth Circuit

5    held that the Federal Reserve Banks are not persons under the

6    Sherman Act, and I believe that is a holding that the

7    Department of Justice agrees with.  At least that's what their

8    papers said.

9         And another example is the Ninth Circuit case in

09:49 10   *Sakamoto*, which I'll go back to Slide 4 so you can see the

11   cite.  That is a case where the -- I believe it was the Guam

12   Airport Authority, that was the instrumentality at issue there,

13   statutorily that was designated as a corporation, not as a

14   federal instrumentality, but it was still held not to be a

15   person.  The same is true, of course, with the *IT & E Overseas*

16   case, the District of DC case in 1990.

17        THE COURT:  Thank you.

18        MS. GIORDANO:  Okay, I wanted to make clear another

19   point about *Flamingo* that I wanted to clear up here, which is,

09:49 20   I think it's apparent from a reading of *Flamingo,* but there are

21   a lot of cases that Verax and DOJ cited about sovereign

22   immunity.  Those cases are not relevant here.  There's no

23   dispute that Congress has waived the Red Cross's sovereign

24   immunity.  We don't dispute it.  We agree that that has

25   happened.  I can assure you, I'd be arguing something very

1    different if it had not, but we go to the second step.  What

2    *Flamingo* says is, just because Congress has waived a federal

3    entity's sovereign immunity does not mean that entity is a

4    person under the Sherman Act.  The question we ask is, is that

5    entity a part of the government for Sherman Act purposes, or is

6    it a wholly private entity that exists outside of the

7    government?  That's our task.  And to answer that question, the

8    Supreme Court tells us we look to the statute because this is

9    fundamentally a question of statutory interpretation.  We're

09:50 10    trying to discern, what did Congress intend the Red Cross to be

11    for purposes of the Sherman Act?

12         Now, there's sort of a simple analytical framework

13    *Flamingo* lays out.  You look at the organizing statute for the

14    entity.  Here, that's Title 36 for the Red Cross.  You look at

15    the statutory designation that Congress gave to the entity,

16    here federal instrumentality of the United States.  And, three,

17    once you've determined that that statutory designation is as a

18    federal entity, that sort of ends the question for Sherman Act

19    purposes unless Congress has given you an express statement

09:51 20    that this particular federal entity is subject to the Sherman

21    Act.  In other words, Congress has to say, "Despite being a

22    federal entity, we want the Red Cross to be subject to the

23    Sherman Act," and it has not done that here.

24         Now, *Flamingo* did go on to talk about some features of

25    the Postal Service statute that showed basically that in fact

1    the Postal Service was a public organization, that Congress had

2    given it national responsibilities and had given it different

3    obligations/rights than private entities; and I don't think you

4    need to do that here because I think that the statutory

5    designation from Congress puts the Red Cross comfortably in the

6    body of law that says it's not a person.  But even if you

7    wanted to go looking in the Red Cross statute for whether

8    Congress has given it, quote, "nationwide public

9    responsibilities" and "different goal obligations and powers

09:52 10    from private corporations," you would see that Congress has

11    given plenty of those things to the Red Cross.  I won't go over

12    all of them in the interest of time.  They're in our brief.

13    But as you can see, this is a very dense slide because there's

14    lots of things in the statute that show that Congress made the

15    Red Cross a public organization, not a private one.

16         THE COURT:  Who pays for the Red Cross other than

17    people who contribute privately through philanthropy?

18         MS. GIORDANO:  So the Red Cross receives primarily

19    money from donations and also from cost-recovery charges that

09:52 20    it receives back when it provides products and sells products

21    to people.  It's a nonprofit organization, but there are some

22    products -- for example, in its blood products business -- that

23    it receives cost-recovery charges so it can recover the costs

24    of manufacturing those products.

25         THE COURT:  Taxpayer dollars don't pay for it?

1           MS. GIORDANO:  Not ordinarily.  Sometimes there are

2     appropriations from Congress to the Red Cross.  From time to

3     time, they do give money to the Red Cross for certain projects.

4     But Congress actually relies on the Red Cross to do all these

5     critically important national responsibilities for this country

6     at really no expense to the federal government, right?  So if

7     we think about the types of entities that Congress would want

8     to make sure were not subject to the Sherman Act, were not

9     subject to treble damages, an entity like the Red Cross that it

09:53 10     is relying on, that currently it doesn't have to find funding

11     for, is relying on to do all these public responsibilities but

12     currently doesn't have to have funding for, imagine a scenario

13     where the Red Cross were subject to treble damages, and then

14     suddenly it didn't have enough money to do all those obligations

15     that Congress needs it to do, Congress is going to have to find

16     the money to do these things.  These are critically important

17     things for this country, and if the Red Cross doesn't do them,

18     Congress is going to have to pay for them.  So you could easily

19     see why Congress would not want the Red Cross to be subject to

09:54 20     the Sherman Act.

21           THE COURT:  All right, so you've pretty much run out

22     of time, but I have one question for you:  If I resolve this in

23     your favor, I'm assuming the rest of the antitrust cases go

24     away but the state cases don't.  State common law cases would

25     have to be separately resolved, right?

1          MS. GIORDANO:  That is -- well, I think the 93A claim,

2     to the extent it was based on the federal Sherman Act theory,

3     that would fall; but if the 93A claim is based on the state

4     claims, you are correct, that is true.  An actual quirk of this

5     whole process is that Congress thinks the Red Cross is such a

6     federal entity that it has created original federal jurisdiction

7     in Federal Court for all claims against the Red Cross.

8     Normally I would be arguing to you, when the federal claims go

9     away, you should not exercise jurisdiction over the state law

09:55 10   claims, but the reality is, this is such a federal entity that

11    Congress has said, everything it does is so federal that all

12    claims against it are heard in Federal Court, not State Court;

13    and actually that was a ruling of the Supreme Court in 1992.

14         THE COURT:  So if I thought that the Red Cross was

15    doing something, say, unconscionable, or I forget the other

16    state tort claims, those all have to be separately resolved

17    regardless of whether it's a federal instrumentality or not?

18         MS. GIORDANO:  The State Court claims, yes, would have

19    to be resolved regardless of whether it's a federal entity,

09:55 20   that is true.

21         THE COURT:  All right, you're out of time, so thank

22    you very much.

23         MS. GIORDANO:  Okay, thank you.  I will stop sharing.

24         THE COURT:  Thank you.  Verax?  Yes, there we go.

25         MR. ABELES:  Okay, and since we're starting in the

1  middle, I'm starting on Slide 13, your Honor.

2       Good morning.  So ARC is in fact a person under the

3  Sherman Act.  The Sherman Act imposes liability on every person

4  who violates it.  Persons include corporations.  ARC is a

5  tax-exempt corporation.  It has a billion-dollar private

6  blood-related business.  I'm going to address the argument that

7  the United States's instrumentalities are automatically

8  considered the United States under the Sherman Act, and, in the

9  course of doing that, talk about a lack of control the nation

09:56 10  exercises over ARC, the lack of evidence that Congress under

11  the Sherman Act or the Red Cross Act intended to make ARC a

12  nonperson, and remind you that, you know, while in the Sherman

13  Act it's not been tested, this principle has been tested in

14  other areas of the law in which the holdings have been that the

15  Red Cross is a corporate person separate from the United

16  States.

17       So ARC plays down its corporate status, but in

18  *Flamingo* it was an important consideration.  "The Postal

19  Service is part of the government," the Court said, "but if

09:57 20  Congress chose to create it as a federal corporation, then you

21  would have to do further analysis."  It's correct, like the

22  example of the Federal Reserve Banks, corporate status does not

23  automatically make you a person but points in that direction;

24  and we pointed out in the *Tennessee Valley* case that the Sixth

25  Circuit picked up on this and said -- and this is a key

distinction between us and *Flamingo*, between the Tennessee

Valley Authority and the Postal Service, is that the Tennessee

Valley Authority is a federal corporation, unlike the Postal

Service.  It's true that the court then ruled against the

defendant on other grounds, but the point is, it is --

THE COURT:  Well, did it hold it was subject to

antitrust?  It did.

MR. ABELES:  Yes, it did, but, yes, for a different

reason, not because it was a corporation, but there was an

alternative reason.

THE COURT:  So what did the --

MR. ABELES:  I'm sorry?

THE COURT:  -- the circuit hold, that TVA was subject

to antitrust or was not?

MR. ABELES:  That it was, that it was.

THE COURT:  Yes.

MR. ABELES:  Yes.  And so, your Honor, there's this

argument that was just presented that instrumentalities are

automatically nonpersons under the Sherman Act unless there's

this separate Congressional statement, but there are numerous

cases that say that the U.S. -- their immunity from law does

not automatically extend to instrumentalities, and if it did,

*Flamingo* would be a lot shorter, okay?  It wouldn't have a

two-part test; it would have a one-part test:  Are you an

instrumentality?  Yes.  You're not a person.  That is not the

1  holding of *Flamingo*.

2          And *Sea-Land* does not hold otherwise.  That was

3  discussed as well.  This is the then Judge Ginsberg case.

4  That's a case that's very distinguishable from this one.  It's

5  a railroad owned and operated by the government in which the

6  holding -- the slide presented by the defendant talked about as

7  a matter of law.  This is the holding right here:  "We hold

8  that the United States, its agencies and officials," meaning

9  outside of the Sherman Act, and that holding is confirmed by

09:59 10  Flamingo.  "The DC Circuit recognized the two distinct

11  inquiries required when the question is whether the government,

12  or an entity it owns, is named as a defendant in a suit under

13  the antitrust laws."  That's where *Sea-Land* has persuasive

14  value, not here.

15          So the real test under *Flamingo* is, you first evaluate

16  whether there's a waiver of sovereign immunity, and there is

17  here, so we move on to the second part, which examines whether

18  the substantive prohibitions of the Sherman Act apply to the

19  entity in question.

10:00 20          ARC has a different test.  We just talked about it,

21  but their test is the quote from their brief:  "Congress'

22  statutory designation of a federal instrumentality renders that

23  entity not a person under the Sherman Act unless there's an

24  express statement from Congress."  But when you look at

25  *Flamingo*, that is not what *Flamingo* says.  That is a mis-

1    reading of *Flamingo*.

2         And I'm going to show you the next slide, and there's

3    other considerations that are mentioned in the bullet, but what

4    *Flamingo* says -- this is what they're quoting from -- "The

5    silence in the Postal Act leads to no helpful inference one way

6    or the other, but the other considerations --" we'll talk about

7    them in a second -- "the other considerations we have discussed

8    lead us to say that absent an express statement from Congress,

9    the PRA does not subject the Postal Service to antitrust

10:01 10   liability."

11        According to the Red Cross, the only consideration --

12   see right above -- is the statutory designation, but that is

13   not what *Flamingo* -- we know that's important, but there's a

14   lot of other important things.  This does not come after that

15   discussion, your Honor.  This comes before.  This is on

16   Page 741 in *Flamingo*.  The relevant quote here is on 746.

17        So under the PRA, So what are the other

18   considerations?  The Postal Service retains its monopoly.

19   Another consideration, it has the right to search and seize.

10:02 20   Another consideration, it's got to provide universal service.

21   Power of eminent domain, regulatory powers, international

22   obligations, all that shows is, as this brief summary

23   indicates, the Postal Service has significant government powers

24   consistent with the status as an independent establishment --

25        THE COURT:  The Red Cross has some of those obligations,

```
 1   right?
 2            MR. ABELES:  It has a few.  It has some obligations.
 3            THE COURT:  I mean, this is a case of first
 4   impression; am I right?  No court in the country has ruled on
 5   it?
 6            MR. ABELES:  Well, it's not ruled on whether the Red
 7   Cross is subject to the antitrust laws, but I agree with you,
 8   your Honor; I have not dealt with issues that are completely on
 9   par with the ones that you are presented with.  But the
10   concepts, the concepts have been discussed at length, as in
11   Flamingo and some of these other cases.
12            And so if I may, your Honor, this last sentence is
13   important.  It says, "With respect to antitrust liability, the
14   PRA neither exempts the Postal Service nor subjects it to
15   liability."  It is silent on the point.  And where did we just
16   see that silent point?  Right here, right here in this area of
17   the case that the ARC focuses on.  The silence in the PRA leads
18   to no helpful inference, but there are other considerations.
19   They are clearly talking about the same thing.  What are those
20   other considerations?  Well, we have the silence, but we have
21   all of these considerations.  So this test that the Red Cross
22   posits is just not the test.  It's not a proper reading of
23   Flamingo.
24            And, look, when it comes down to it, none of those
25   considerations are here, your Honor, save for the one that you
```

1    just mentioned about some international obligations, but it's

2    not an independent establishment of the Executive Branch.  And

3    let me just make the point.  When we talk about an independent

4    establishment --

5             THE COURT:  So let's say you win your points and you

6    get treble damages, does that essentially mean the Red Cross

7    can't serve the military?

8             MR. ABELES:  No, your Honor.  I mean, this is a

9    billion-dollar business that they run.  They make an awful lot

10:04 10   of money, and I doubt that Congress will allow our military to

11   suffer because of this case, but -- so, no, I don't believe so.

12            THE COURT:  This is a very close call here, isn't it?

13   I mean, it's hard.

14            MR. ABELES:  I appreciate the position you're in, your

15   Honor, but I don't believe that it's a difficult call because

16   the real test looks for what form the defendant takes, is it a

17   corporation?  And not dispositive but directionally important.

18   And would Congress have intended the Sherman Act to cover this

19   entity?  And you can see, I mean, they give the Postal Service

10:05 20   a monopoly.  How do you enforce the antitrust laws against an

21   entity that you grant a monopoly that doesn't set its own

22   prices and so forth?  And what the Red Cross says is, the

23   price-setting, that doesn't matter.  That's exactly what

24   they're saying.  It also does not matter, as Verax claims -- as

25   Verax claims -- that the Red Cross sets prices for blood

1    products.  Now, we did claim that, but we were quoting

2    *Flamingo*.  It's *Flamingo* that claims that this is important:

3    "The Postal Service lacks the prototypical means of engaging in

4    anticompetitive behavior:  the power to set prices."  I think

5    in an antitrust case, the prototypical means of engaging in

6    anticompetitive behavior matters.

7           And, look, you know, we mentioned this before, your

8    Honor, and the DOJ did as well, that the Red Cross is not in

9    the Sherman Act, fair enough, your Honor; but in other areas of

10:06 10    law, when the issue has been presented, the courts have

11    generally concluded that ARC and the United States are

12    separate.  And that's my argument on this issue, your Honor.

13           THE COURT:  Thank you.  So the government, DOJ.

14           MR. ADAMSON:  Yes, good morning, your Honor.  My name

15    is Joseph Adamson again.

16           THE COURT:  Why don't we take down your slide from

17    Verax.

18           MR. ABELES:  Oh, sure.

19           THE COURT:  Perfect, because I could barely see you.

10:07 20    You were disappearing off my screen.

21           MR. ADAMSON:  Thank you, your Honor.  Again, my name

22    is Joseph Adamson representing the United States, and I want to

23    thank you for the opportunity for the United States to file a

24    statement of interest in this matter and to speak today.  The

25    United States filed a statement of interest because it has an

1    interest in insuring the correct application of the antitrust

2    laws.  I want to reiterate --

3          THE COURT:  Excuse me.  Are you from the Antitrust

4    Division?

5          MR. ADAMSON:  Yes, I am, and I want to reiterate what

6    we stated in our brief, that we take no position on the merits

7    of the complaint or the other arguments raised in the motion to

8    dismiss briefing, other than the Red Cross's argument that it

9    is a part of the United States and is not subject to the

10   Sherman Act.

11         Our position, the position of the United States, is

12   that the American National Red Cross is no part of the United

13   States but is a person subject to the Sherman Act.  And

14   hopefully I won't rehash too much of what you've already heard,

15   but under the controlling case, *Flamingo*, the Red Cross is not

16   part of the United States because the United States lacks

17   control, ownership, and oversight of the Red Cross.  The

18   President does not appoint any of the Red Cross's governors,

19   and the Red Cross also lacks the governmental characteristics,

20   such as powers of eminent domain or the power to issue

21   regulations, the courts have found relevant to analyzing

22   whether an entity is a part of the United States for the

23   purposes of the Sherman Act.

24         The relevant law starts with the Sherman Act.  The

25   Sherman Act includes, among its definition of persons who are

1    subject to the Act, corporations like the Red Cross.  The Red

2    Cross contends that because Congress --

3         THE COURT:  Well, the Red Cross is a hybrid, right?

4    That's what makes it so hard.  I mean, it does have certain

5    governmental functions, but it also acts like a private actor

6    in setting prices.  It's a very difficult issue.

7         MR. ADAMSON:  Well, I understand your question, your

8    Honor.  We think under the proper analysis under *Flamingo* --

9         THE COURT:  What do they call those men in mythology,

10:09 10   half men, half horses?  I mean, it's sort of -- I don't know,

11   it just strikes me as if it's a very -- no one has really ruled

12   on it, and they do have some aspects of being a governmental

13   entity.  They're called a federal instrumentality.  On the

14   other hand, a lot of the powers you usually think of they don't

15   have.

16         What is DOJ relying on?  In the Antitrust Division,

17   would it feel empowered to prosecute or sue the American Red

18   Cross?  Has it ever thought about that?

19         MR. ADAMSON:  I don't know if it has ever happened in

10:10 20   prior Antitrust Division, but under the reading in *Flamingo* and

21   under the text of the Sherman Act, the United States believes

22   that it's clear that the Red Cross is not a part of the

23   government due to the lack of government oversight and control.

24         And, again, because the Red Cross is acting here in

25   this matter -- its blood product business engages in hundreds

1    of millions or billions of dollars of commerce annually -- that

2    is a significant area of commerce that they're looking to

3    remove from oversight of the competition laws, the antitrust

4    laws in this country.  So --

5         THE COURT:  Well, can I ask, if I took them out of

6    antitrust liability, are they subject to control at all by the

7    Federal Trade Commission or by any other entity, or are they

8    basically free to do what they want?

9         MR. ADAMSON:  They're not subject to control by the

10:11 10    government outside of, in the context of competition, outside

11    of the application of the Sherman Act for them.

12         THE COURT:  So the FTC wouldn't have jurisdiction

13    either?

14         MR. ADAMSON:  If they're not subject to the Sherman

15    Act as part of the United States, then I, uhm --

16         THE COURT:  Anyway, maybe I caught you unawares,

17    because it is troubling that on the one hand, if you found the

18    antitrust liability, you could put them out of business for

19    purposes of their international and military obligations.  On

10:11 20    the other hand, if you don't find it, they can do whatever they

21    want anticompetitively, and the government has no control over

22    it.  It's sort of a difficult position, right?

23         MR. ADAMSON:  Well, your Honor, I guess in the context

24    of that question, there are dozens, hundreds, probably

25    thousands of private corporations that do significant business

1  and provide services to the U.S. military who are all subject

2  to the Sherman Act and subject to the antitrust laws.

3  THE COURT:  Okay.  So it's the position of the

4  Department of Justice that it's subject to Sherman?

5  MR. ADAMSON:  Yes, it is, your Honor.

6  THE COURT:  And other than *Flamingo*, is there any key

7  case that you would bring my attention to, and *Sea-Land*?

8  MR. ADAMSON:  Yes, your Honor.  So *Flamingo* controls

9  here, and under *Flamingo,* the Red Cross's reading is a

10:12 10  misreading.  *Flamingo* did not rest at Congress' designation of

11  the Postal Service as an independent establishment of the

12  Executive Branch of the United States.  The court considered

13  that as one factor, but the whole analysis of the Postal

14  Service's connections to the government in terms of oversight

15  and control, the powers of Presidential appointment over the

16  Board of Governors, as well as powers that Congress had granted

17  to the Postal Service, such as the powers of eminent domain or

18  the power to issue appropriate regulations, as well as

19  limitations that Congress had imposed on the Postal Service

10:13 20  such as on the power to set prices, and here none of those

21  factors apply to the Red Cross.

22  And going back to *Flamingo*, after analyzing all of

23  those factors and not just Congress' designation of the Postal

24  Service, the Supreme Court concluded in *Flamingo* that in form

25  and function, the Postal Service was a part of the United

1   States.

2         And it's also important to note, as counsel for Verax

3   noted, that when the Supreme Court considered Congress'

4   designation of the Postal Service, it did note that its

5   analysis would be different if Congress had designated the

6   Postal Service -- had created the Postal Service as a

7   corporation, and that is because corporations are explicitly

8   included among persons who are subject to the Sherman Act.  The

9   Sherman Act does not mention instrumentalities anywhere in its

10:14 10   text.  *Flamingo* does not mention instrumentalities anywhere in

11   its text.

12         And the Supreme Court's endorsement of *Sea-Land* as,

13   again, counsel for Verax pointed out and put up on their

14   slides, the endorsement of *Sea-Land* and *Flamingo* was limited to

15   its proper application of the two-step analysis to determine

16   whether an entity could be sued and then whether it was subject

17   to the acceptance of law in question.

18         THE COURT:  All right, thank you.

19         MS. GIORDANO:  Your Honor, may I just have ninety

10:14 20   seconds to respond?  I promise I can do it in ninety seconds.

21         THE COURT:  Ninety seconds you have.  But don't

22   forget, every second -- you know, there's very complicated

23   antitrust case issues as well.

24         MS. GIORDANO:  Yes, I will happily take ninety seconds

25   from my antitrust argument.  One point one, in the *Flamingo*

1    case at Page 747 to 748, the Supreme Court recognized the

2    Postal Service has lines of business for which it sets prices

3    independently and for which it operates for profit.  That did

4    not trouble the Supreme Court because it found overall the

5    Postal Service was part of the government and not a person.

6          Number two, you asked, well, what would happen here if

7    you did not subject the Red Cross to the Sherman Act, there

8    would be no control?  Congress has control here, your Honor.

9    It simply has to say -- if it wants the Red Cross to be subject

10:15 10    to the Sherman Act, it simply has to say so, so they control

11    the outcome.

12          THE COURT:  Congress, I mean, they don't do oversight

13    hearings.  So you mean you're going to try and get a majority

14    of each house?  That's your control?  I mean, it's not like

15    there are oversight hearings or anything like that.

16          MS. GIORDANO:  They have a lot of oversight and a

17    regular supervision of the Red Cross.

18          THE COURT:  Do they?  Do they have hearings, oversight

19    hearings?

10:16 20          MS. GIORDANO:  Not hearings, but there are reports to

21    ten separate members of Congress every year about everything

22    the Red Cross is doing, every dollar it's spending and every

23    dollar it's taking in.

24          THE COURT:  By request or by --

25          MS. GIORDANO:  By statute.  I go back to my slide.

|    | |
|----|--|
| 1  | They have ordered the Red Cross to file every year.  The |
| 2  | Secretary of the Department of Defense audits our financials, |
| 3  | and those are reported to Congress.  There is an annual report |
| 4  | on everything we do, including all of our blood business, to |
| 5  | ten separate committees in Congress, five in the House, five in |
| 6  | the Senate every year.  They know everything that we're doing |
| 7  | every year.  There's a lot of -- |
| 8  | THE COURT:  That's helpful.  Okay, end because we have |
| 9  | so much to do. |
| 10:16 10 | MS. GIORDANO:  Thank you, thank you, thank you. |
| 11 | THE COURT:  So it's now 10:15.  I have another hearing |
| 12 | at 11:30, which is why that becomes a hard stop.  So if the |
| 13 | government -- thank you very much -- I'm going to ask you to |
| 14 | turn off your camera.  All right, thank you very much for |
| 15 | participating. |
| 16 | So I think at this point, half an hour, half an hour, |
| 17 | does that make sense on the antitrust?  And maybe a blurb |
| 18 | afterwards on the state law claims.  And I also have to give my |
| 19 | court reporter a break between the two hearings.  So, all |
| 10:17 20 | right, let's go. |
| 21 | MS. GIORDANO:  Okay, thank you, your Honor.  So |
| 22 | putting aside the question of whether the Red Cross is subject |
| 23 | to the Sherman Act, even if it is, we believe there's independent |
| 24 | reasons why the Red Cross is -- these antitrust claims still |
| 25 | fail on their merits, and I'm going to touch on those specific |

1    reasons in a moment.  But there's a core nucleus of undisputed

2    facts here that I want to talk about first because it's this

3    core nucleus of facts that are not in dispute and are, frankly,

4    indisputable that is the reason Verax's antitrust claims fail

5    for multiple different reasons, so if you can just bear with me

6    for a moment because I think it's important to understand these

7    facts.  And, honestly, I'll be candid:  This is a hard subject

8    area to understand, at least it was for me in the first instance.

9        This is a case about platelets, which is a blood

10:18 10   product.  It is the cell fragments in blood that cause

11   clotting, okay, so this is a really important medical product.

12   It saves lives on a daily, if not minute basis every day.  The

13   unique thing about platelets is that they have to be stored at

14   room temperature.  They can't be frozen or refrigerated, and

15   that means they have a very short shelf life.  So from the time

16   you take the platelets out of the donor's arm to the time that

17   they have to get into a patient is, for Red Cross platelets,

18   five days or less.  Sometimes it can be seven days.  It's never

19   more than seven days.  So you have one week or less to get

10:18 20   these things into patients, so that's a pretty big deal.

21        They are also, because it has to be stored at room

22   temperature, susceptible to bacterial contamination; and if you

23   transfuse platelets that have bacteria in them into a patient,

24   that can cause many bad things to happen, including such

25   disastrous outcomes like sepsis and death.

1           So it's no surprise that platelets, like most blood

2    products, are heavily regulated by the FDA.  I'm just going to

3    put my slides up here again for your benefit.  Can you see

4    them?

5           Okay, there are many rules and regulations that apply

6    to all blood products and that apply to platelets.  This case

7    happens to only involve just one.  It's 21 CFR, Section 606.145,

8    and this is a regulation that applies to all blood collection

9    establishments, which includes the Red Cross.  And it says

10:19 10   that --

11          THE COURT:  So you're not -- I did have that

12   question -- you're not considered a transfusion service?

13          MS. GIORDANO:  We are a blood collection establishment.

14   we don't transfuse.

15          THE COURT:  Okay, you never transfuse.  Okay.

16          MS. GIORDANO:  No.  But, of course, the regulation

17   says this is an obligation:  We must assure that the risk of

18   bacterial contamination is adequately controlled -- it's not

19   optional -- and we have to do so using FDA-approved techniques.

10:20 20   This is not in dispute here at all, your Honor.  And in fact

21   there's no dispute here that to date, the FDA has only approved

22   three methods for the Red Cross to satisfy its obligations

23   under Section 606.145.  There's only three choices.  We have to

24   do one of these three things, but we can only do these three

25   things, not anything else.

1          So the first two choices that the FDA has given to us

2     is the Choice 1, primary culture, and Choice 2, LVDS, which

3     stands for large volume delayed sampling.  Those are just two

4     different types of tests.  Basically, under both of those

5     methodologies, you take a sample of the platelet, and you test

6     it to see if it has bacteria in it.  If it does, you throw the

7     dose away, and you move on to the next dose.  They're just

8     tests.  They're different types of tests, but they're tests.

9          Choice 3, very, very different from the first two.

10:21 10   Pathogen reduction is not a test.  It is a technology where you

11    take the platelets out of the donor's arm into a bag.  You then

12    add a DNA cross-linker to the bag, and you subject the bag to

13    ultraviolet light.  And that process inactivates the bacteria

14    that may be in that platelet bag, as well as other pathogens

15    that might be in there, other viruses, other parasites that

16    might be in there.  So pathogen reduction doesn't just deal

17    with bacteria like Choice 1 and Choice 2.  It also inactivates

18    other bad things.

19          The other thing -- and this is not in dispute here,

10:21 20   this is right out of the FDA -- what pathogen reduction takes

21    care of is pathogens we know about today and even ones we may

22    not know about.  The classic example is Zika.  A few years ago

23    I had never heard of Zika, but then it was all over the news as

24    a new virus that was really having disastrous impacts on babies

25    and pregnant women.  The FDA said:  Pathogen reduction, that

1    takes care of Zika.  It inactivates Zika.  If you use it on

2    platelets, those platelets are now safe to transfuse in the

3    patients.  You never have to throw those doses away.  You can

4    inactivate the Zika, and they're now safe to be transfused, all

5    in a one-step process.  It takes care of all the bad things in

6    one step.

7         And right now today, we don't know what the next Zika

8    is going to be.  We may not have named it, we may not have even

9    discovered it yet, but pathogen reduction right now today is

10:22  10   already taking care of things we don't even necessarily know

11   about in those platelet doses that are being transfused into

12   patients.

13        Where does Verax fit into this process?  It has a very

14   narrow role to play here.  Verax fulfills a second step in

15   Choice 1 and sometimes in Choice 2.  What I mean by that, in

16   Choice 1, the FDA said the blood center has to do primary

17   culture before it can release platelets to hospitals.  But

18   those, if you just do Choice 1, when they get to the hospital,

19   the hospital is not permitted to transfuse them yet.  They're

10:23  20   not safe for transfusion.  The hospital has to do a second

21   step.  The blood center has released them to the hospitals, but

22   the hospitals have to do something with their own personnel and

23   at their own expense.  The hospital has a choice:  They can

24   redo the first culture again, just do that same primary culture

25   again -- it's called "secondary culture" -- or the hospital can

1    buy one of Verax's tests for the second step of the process.

2    And once the platelets have passed, sometimes Verax fills that

3    second role in Choice 2 with LVDS for a very specific type of

4    LVDS platelet called LVDS 36, but that second step at the

5    hospital is the role that Verax plays.

6        The FDA has not approved Verax's test as a standalone

7    method for bacterial mitigation.  No blood center and no

8    hospital can use Verax by itself as a way to satisfy federal

9    law requirements to mitigate bacteria.  It's always a second

10:24 10   step in a process after the blood center has already done some

11   form of bacterial mitigation.  Again, not in dispute, right in

12   Paragraph 82 of the complaint.

13       So the Red Cross, of course, like all blood centers,

14   had to make a choice:  Which of these things did it want to do?

15   And it carefully studied the three options the FDA gave to it

16   and decided, for reasons I hope are obvious, that it was going

17   to pick Choice 3 instead of Choice 2 or Choice 1, and that is

18   because that pathogen reduction deals with more than just

19   bacteria.  It takes care of other bad things too; and because

10:25 20   it inactivates the bad things, you don't have to throw doses

21   away.

22       THE COURT:  You keep talking about Choice 3 as being

23   the best choice, and the way you describe it, I certainly

24   understand your position, but none of that's in the complaint.

25       MS. GIORDANO:  So none of it is in the complaint about

1    how these processes work?

2         THE COURT:  Well, just on a motion to dismiss, I'm

3    sort of bound by the four corners of the complaint.  I mean,

4    for purposes of my ruling, which is the preferable one is

5    really not before me.

6         MS. GIORDANO:  So what I would say about that is, what

7    is in the complaint is the FDA's December, 2020 guidance

8    document --

9         THE COURT:  Yes.

10:26 10    MS. GIORDANO:  -- which, you know, is a very thick

11    document with actually everything I just told you is in there.

12    It just describes these three processes, how they work.

13         THE COURT:  Does it say Choice 3 is the best?

14         MS. GIORDANO:  No, it does not.  It does not.  And in

15    fact, I know that Verax is going to say this, so I want to come

16    right out front and say it:  For purposes of bacterial

17    mitigation, the FDA has been very clear that it believes all

18    three of these choices are okay for purposes of bacterial

19    mitigation.  It did not say, "You should pick Choice 3,

10:26 20    everyone," that is true, and I know Verax is going to say that.

21         My point is that when you are given these three

22    choices, what the Red Cross did was look at them and say,

23    "Well, I have only these three choices, and I have to do one

24    for bacteria, so I'm going to pick the one that does more than

25    just bacteria.  I get more things accomplished in one step than

1    if I picked Choice 1 or Choice 2."  That's all I'm saying.

2            This case, of course, as your Honor knows, is about

3    the fact that Verax would prefer that the Red Cross had picked

4    Choice 1, I think primarily maybe to some extent Choice 2, but

5    it does not like the fact that the Red Cross picked Choice 3.

6            THE COURT:  And does the Red Cross do Step 3?  It does

7    not.  It's another company called Cerus, right?

8            MS. GIORDANO:  We perform the pathogen reduction, but

9    that is a great point.  Thank you for pointing that out.  The

10:27 10   Red Cross does not own the pathogen reduction technology.  We

11   have to buy it from a third party --

12            THE COURT:  The technology is the product?

13            MS. GIORDANO:  The technology is a manufacturing

14   process, right?  Remember I talked about the DNA cross-linker,

15   the ultraviolet light?  It's a whole process.  You have to take

16   the platelets out of the arm in special kits to use them on the

17   machines.  It's a -- I mean, Verax makes a little fun of us in

18   our brief for calling it a "manufacturing process."  That's not

19   our words.  That's actually the FDA's terminology because this

10:27 20   is far more complex than I certainly have ever imagined.  You

21   don't just take it out of the arm, bag it up and ship it off.

22   It is an immensely complex --

23            THE COURT:  It's a much narrower point.

24            MS. GIORDANO:  Yes.

25            THE COURT:  So essentially the American Red Cross buys

1  this technology from another company?

2          MS. GIORDANO:  Yes.

3          THE COURT:  They're not selling this technology?

4          MS. GIORDANO:  No.  We use the technology in our

5  manufacturing process that we buy from a third party.

6          THE COURT:  And you don't have to have a separate --

7  it's not like a separate rapid test for each blood -- it's

8  one -- you bought it once, and then you use it on everybody?

9          MS. GIORDANO:  We have to buy kits, and the kits come

10:28 10  to us, and we have a contract with Cerus in order to be able to

11  apply pathogen reduction to each dose as we do that work.

12          THE COURT:  A kit per dose, is that it?

13          MS. GIORDANO:  Yes.

14          THE COURT:  Okay.

15          MS. GIORDANO:  Okay, so you mentioned, and I think you

16  were absolutely right, that this is a case where there is a lot

17  that's going on in antitrust claims, and we've made several

18  different arguments.  I was trying to think about how to

19  simplify our point for the Court in this case, what is it that

10:29 20  I think most fundamentally is wrong with Verax's antitrust

21  theories; and I think, I hope maybe, one simple way to explain

22  it is the famous Footnote 40 from the Supreme Court's *Jefferson*

23  *Parish* case in 1984 that both parties cited.

24          What the Supreme Court said there is, "The antitrust

25  laws do not give a purchaser the right to buy a product that

1    the seller does not wish to offer for sale."  And the example

2    they use is, "A grocer may decide to carry four brands of

3    cookies but no more, and if the customer wants a fifth brand,

4    he can go elsewhere, but he cannot sue the grocer even if there

5    is no other in town."

6         And this case at its core is about the fact that Verax

7    wants to use the antitrust laws to force the Red Cross to sell

8    a fifth brand of cookie, except we're not talking about

9    anything as innocuous as a cookie.  We're talking about a

10:30 10    lifesaving blood product, and they want to use the antitrust

11    laws to force the Red Cross to pick Choice 1 or Choice 2, even

12    though Choice 3 deals with more bad things than just bacteria.

13         THE COURT:  But you're once again going beyond the

14    four corners of the complaint.  Essentially all I have right

15    now is, the Red Cross prefers this third approach, the one-step

16    rather than the two-step.

17         MS. GIORDANO:  And honestly, your Honor, that is

18    *Jefferson Parish,* Footnote 40.  You don't even have to go on to

19    my good reasons for it.  You can skip that there's a very good

10:30 20    reason for Step 3.  *Jefferson Parish* says, for no other reason,

21    if we just simply only want to offer Choice 3, we don't have to

22    also offer Choice 1 and Choice 2.  The antitrust laws don't

23    make us have to do that.

24         THE COURT:  What is the market power of the Red Cross?

25    What percentage of the platelets does it have?

1       MS. GIORDANO:  Again, I'm constrained, I think you

2   would tell me, by what the complaint alleges.  The complaint

3   alleges 40 percent.  I don't believe it is that high, but that

4   is what the complaint alleges.  And I'm going to abide by the

5   Rule 12 obligation, so that's what I have to go with.

6       THE COURT:  Okay, 40 percent of market, is that enough

7   to be a monopoly under the laws?

8       MS. GIORDANO:  No, it is not.  It is not.

9       THE COURT:  -- higher.

10:31  10       MS. GIORDANO:  You are absolutely right, it is not.

11   And the point is that even under these allegations, 60 percent

12   of the market, what they allege is, we're selling today the

13   40 percent.  That doesn't mean those people have no other

14   choices.  It just means today they're choosing to buy from us.

15   There's 60 percent of the market according to Verax, at least,

16   that is getting their platelets from some other source that's

17   not us.

18       THE COURT:  All right, thank you.

19       MS. GIORDANO:  Okay, so let me now go to the specific

10:31  20   arguments that we have made.  The first one is antitrust

21   injury.  As the Court may recall from its prior cases,

22   antitrust injury is an essential element of every antitrust

23   claim.  So this particular argument that Verax has not pled

24   antitrust injury would take care of all three of their

25   antitrust claims for the same reason:  It is an essential

1    element of the claim, and it's an element that requires Verax

2    to plead that it has suffered an injury from a

3    competition-reducing aspect of the defendant's behavior.  It's

4    a prudential concern.  It's created by judges on the theory

5    that we don't want everybody who may be claiming to have been

6    tangentially injured by an antitrust violation to have standing

7    to come into court to sue.

8         So the courts, they come up with some general

9    categories of the types of plaintiffs that are found to have

10:32 10    suffered a cognizable antitrust injury and the types who have

11    not.  And what those cases, if you distill them down, they say

12    essentially is:  Typically only consumers or competitors of the

13    defendant in the allegedly restrained market have antitrust

14    injury, and on the flip side, typically, parties who have

15    claims that are just derivative injuries, such as suppliers or

16    potential suppliers to the defendant's customers, those types

17    of parties don't have antitrust injury that's cognizable under

18    the antitrust laws.

19         I don't believe there's actually any dispute about

10:33 20    these principles here.  The dispute is that Verax contends it

21    has done enough in the complaint to allege that it is the Red

22    Cross's competitor, and we don't think it has.

23         So "competitor" under the antitrust laws has a very

24    specific legal meaning.  Two companies are competitors when

25    they sell products that the customers believe to be reasonably

interchangeable.  That's the *Flowvac* case from the First

Circuit, 817 F. 3d 849.  And Verax and the Red Cross simply

don't sell products to hospitals that hospitals believe to be

reasonably interchangeable with each other.  We don't compete,

these two companies do not compete for any hospital business.

The Red Cross sells platelets that it has manufactured in

compliance with its FDA obligations, right?  We have to do one

of those three bacterial mitigation methodologies, and Verax

sells an aftermarket test that some hospitals in some

circumstances may choose to buy in addition to, but never in

lieu of, Red Cross platelets.

So if you think about it, even if we did Step 1, which

is what Verax wants us to do, the Red Cross is still selling,

would still be selling platelets that have had bacterial

mitigation done to them.  Red Cross would have done primary

culture and testing on those platelets and would sell those

platelets to the hospital, and then the hospital might -- might

decide to buy Verax's test.  But they're never substituting a

product we sell for what Verax sells, and that means we're not

competitors within the meaning of the antitrust laws.

What Verax is is a supplier, an aftermarket supplier

to some hospitals that also have bought something from the Red

Cross, and under antitrust injury doctrine, that means they

have not stated a cognizable antitrust injury.

I'm going to go on to the tying claim unless you have

1    more questions about antitrust injury.

2              THE COURT:  No.

3              MS. GIORDANO:  So for the tying claim, I will confess

4    to you that it took us a little while to get to understand what

5    Verax specifically was alleging were the two products that we

6    were tying together.  Before we filed our motion to dismiss, we

7    wrote to them and said, "We're not sure what the complaint

8    means, here's how we're interpreting it," and we didn't get a

9    lot of confirmation back.  So I confess to you that our briefs

10:36 10   had to shift because in their opposition, they finally made

11   clear what it was they were actually alleging here; and now

12   that we know that, it is actually a little bit simpler than I

13   even thought.

14             So what a tying claim is, is that a party sells one

15   product called the "tying product" on the condition you also

16   buy a second product.  Basically, "I'm not going to sell you

17   this one thing you really want," the tying product, "unless you

18   also buy this second product."  That's the threshold aspects of

19   a tying claim.  And so a threshold predicate of the claim is

10:36 20   that the defendant actually sells that tying product, right?

21   That's kind of baked into the whole theory, that you sell the

22   thing defined as the tying product.  But Verax doesn't allege

23   that here.  What Verax alleges --

24             THE COURT:  You're saying -- wait a minute -- the

25   seller has to own both the tying and the tied product?  No.

1          MS. GIORDANO:  Not that it has to own both; that it

2     has to actually sell the tying product, meaning the product

3     over which you supposedly have market power and control.

4          THE COURT:  So the tying product would be the blood,

5     and the tied product would be the process for cleaning it?

6          MS. GIORDANO:  Exactly, exactly, and let me pull that

7     apart.  The tying product, according to Verax, is platelets on

8     which no bacterial mitigation has been done.

9          THE COURT:  Right.

10:37 10          MS. GIORDANO:  And the tied product is the bacterial

11     mitigation that you do on the platelets.  Those are the two

12     products.  As a matter of law, the Red Cross does not sell and

13     cannot sell platelets where no bacterial mitigation has been

14     done to them.  That's the regulation we just looked at.  That

15     tying product that they say that we sell that we have monopoly

16     power over, we cannot legally sell it as a matter of law, and

17     we don't legally sell it.  The only thing the FDA allows the

18     Red Cross to sell is platelets that have had one of those three

19     forms of bacterial mitigation done to them.  We can't sell raw

10:38 20     platelets.

21          And I want to point out that this is not a function of

22     whether customers would prefer to buy raw platelets, unmitigated

23     platelets from us.  That does not matter, the Supreme Court

24     tells us in *Jefferson Parish*, right?  Because our question is,

25     is this a product that people could buy if they wanted to,

easily could buy if they wanted to? And the answer here for the tying product is "no." If a hospital came to the Red Cross today and said, "Actually, thank you very much. We don't want any bacterial mitigation from you at all. You just take the platelets out of the arm and send us the doses --"

THE COURT: Yes, but here's what -- I mean, what Verax is saying is that your product is $150 more per dose expensive than theirs. So could a hospital go to them and say, "We just want your product with Step 1"?

10:39 MS. GIORDANO: So the answer is, the Red Cross doesn't want to offer a Step 1 product to sale for hospitals, right? That's the Footnote 40. We don't want to have to offer a brand of cookies. We only want to offer the brand of cookie that we want to offer, which is --

THE COURT: It does have a big price impact, right?

MS. GIORDANO: Well, it has a big price impact for reasons we can't talk about, right, because it does very different things.

THE COURT: You're saying it's a better mousetrap, but

10:39 I can't do that right now.

MS. GIORDANO: Right, I understand that. I understand that, but you can do this on the complaint without having to go outside the complaint. What you can recognize from the four corners of the complaint, and from what the FDA guidance document that is cited in the complaint says, you can recognize

1    that Verax's test is the second step in a two-step process,

2    where somebody, a blood center, has already spent time and

3    money doing the first step, and then the hospital has to spend

4    time and money to do the second step.  That's right in the

5    complaint.  So your comparing Verax's $25 test doesn't account

6    for all the expense it takes to get to that second step, right?

7    You're not comparing apples to oranges.  Does that make sense?

8    PRC's one step, one process, $150.  Verax's test is the second

9    step in a much larger process, and they're only comparing the

10:40 10   price of their product, and they're not factoring in all the

11   money it takes to get to that second step before you can even

12   use Verax's product.

13           THE COURT:  All right.

14           MS. GIORDANO:  Okay, I believe that's actually all I

15   have on tying.  Would you like me to move on to exclusive

16   dealing and attempted monopoly?

17           THE COURT:  Well, again, you're almost out of time,

18   so --

19           MS. GIORDANO:  Okay, this one is really simple as

10:40 20   well, and I can do it very quickly because it's the same reason

21   for these two claims.  And, by the way, these are all

22   independent legal arguments.  The exclusive dealing and the

23   monopoly claims fail for the simple reason that I don't see any

24   evidence in the complaint of cognizable allegations of harm to

25   competition.  And this principle, right, is that you have to

1    show not just harm to Verax; you have to show harm to

2    competition in the marketplace generally.  Something the Red

3    Cross has done has had to reduce the number of competitive

4    options available in the marketplace.

5            And, yes, I see, I know that Verax has a whole section

6    of their complaint called "Harm to Competition," and I know

7    they use a lot of buzz words there.  But what the facts of the

8    complaint actually show, really, truthfully is alleged, is that

9    there hasn't been a reduction in the types and technologies of

10:41 10   bacterial mitigation that are available in the marketplace.

11   There's an increase.  Back before the FDA approved pathogen

12   reduction to be one of these methods, before 2015, primary

13   culture was really all there was you could do.  So of course

14   that was great for Verax.  They were pretty much the only game

15   in town because you could only do Choice 1.  But then the FDA

16   approved LVDS, and then they approved pathogen reduction, so

17   there's been an increase in the number and technologies and

18   options available for bacterial mitigation, not a decrease.

19   And Verax is complaining about an injury it has suffered from

10:42 20   an increase in competition with them.  There are new

21   technologies to do bacterial mitigation that there did not used

22   to be, and that has made Verax's product less commercially

23   relevant.  That is not an antitrust violation, your Honor.

24            I'll stop there.  I know I'm out of time.

25            THE COURT:  Yes, thank you.

1          (Discussion off the record.)

2          THE COURT:  Maryellen, do you know, is our 11:30 in

3     person?

4          THE CLERK:  No.  It's by video, and I emailed them, so

5     it's ready to go at 11:30.

6          THE COURT:  Okay, all right, thanks.

7          All right, go for it, Verax.

8          MR. ABELES:  Thank you, your Honor.  So we just heard

9     a summary of the defenses in this case, which are essentially

10:43 10    that we lack standing.  The complaint dealt with antitrust

11    injury.  Antitrust injury is actually an element of standing.

12    It doesn't really matter for purposes of this argument.  Verax

13    doesn't sell the tying product, and that there's been no harm

14    to competition.  We already talked about the last point.  All

15    three of these points are actually different ways of saying the

16    same thing, that ARC and Verax are not competitors.  That's

17    really the issue as to each of these defenses.

18          There's talk that we changed our relevant markets and

19    so on.  True confessions for me, I'm not sure why, because we

10:44 20    always defined the tying market as the FDA-cleared products for

21    bacterial mitigation in the guidance-type documents that have

22    been pointed out by both parties.  So, yes, your Honor

23    recognized, and as counsel conceded, the FDA doesn't recommend

24    one over the other.  Bacterial detection devices, that covers

25    LVDS, and our rapid-test pathogen reduction, that's the

1    technology developed by Cerus that ARC now employs, and it's

2    either a single step or a two step.  The Cerus technology

3    involves one step; ours involves two.

4         So here's what the market looks like, your Honor.

5    Prior to October, 2021, when ARC began tying its blood

6    platelets to a bacterial mitigation service, the PRT service,

7    some hospitals went with this single step, the PRT process.

8    Most did not.  Most did not.  What they did was, as counsel

9    pointed out, they combined a primary culture, which tests for

10:45 10   carbon dioxide.  It's a much simpler test than ours.  Verax's

11   test tests for diseases, not just the presence of carbon

12   dioxide.  The reason you test for carbon dioxide is, that

13   indicates bacterial growth.

14        So in this free market, hospitals chose our product

15   75 percent of the time.  And we did, by the way, your Honor,

16   talk about the advantages and disadvantages of the products.

17   We have a whole section in our complaint.  One, why would the

18   market vote for Verax?  Well, there's a variety of reasons:

19   It's less expensive.  It does not degrade platelet quality,

10:46 20   very, very important.  As we allege, there's a significant

21   degradation of platelet quality when you use the Cerus.  So

22   what does that mean?  You've got to buy the more expensive

23   product -- it is much more expensive -- and -- and you have to

24   buy more blood.

25        THE COURT:  But this 75 percent, it's before the FDA

1  approved these two other --

2       MR. ABELES:  No, your Honor.  These were all in the

3  market starting at least in 2015, I believe.  I'll stand

4  corrected on that, but not all of these products that you see

5  on this slide were in the market prior to the time when Verax

6  was the dominant player in the market.

7       And so what happens?  What happened in this case, your

8  Honor?  Well, they began to tie their platelets and their

9  bacterial mitigation service, so Verax gets foreclosed from its

10:47 10  sales to its own customers, and, by the way, to the Red Cross's

11  customer there.  If it wants to offer that customer that it

12  thought PRT was better, make a pitch, it you can't do that.

13  Neither can anyone else, your Honor.  The reason there's harm

14  to competition here is because if they knew --

15       THE COURT:  Can I stop you.  Can't they use any method

16  that the FDA approves?  Like, the FDA gives you three choices,

17  and can't they decide to do one?

18       MR. ABELES:  They can pick the one they want, your

19  Honor, but there is a rule against tying.  Monopolists do not

10:48 20  have the same freedom in our economy under the Sherman Act that

21  other companies do.  Antitrust --

22       THE COURT:  Is 40 percent enough to be a monopoly?

23       MR. ABELES:  It is.  Yes, it is, your Honor.  They

24  didn't argue whether they have market power, monopoly power.

25  That's not one of their arguments, so there were three --

1          THE COURT:  Okay, I'm sorry.  Just I've had other --

2          MR. ABELES:  That's okay, your Honor, but let me just

3      explain why that is, okay?  If you have a market where you've

4      got one party with 40 percent, another with 30, another with 20

5      or 30, yeah, the one with 40 probably does not have monopoly

6      power in that situation because when it raises its prices,

7      folks can shift to the other two dominant players.  In this

8      market, though, you've got one guy with 40 percent, and the

9      rest of the market is -- it's called "atomized" -- a bunch of

10:49 10     very, very small players.

11          THE COURT:  I see.

12          MR. ABELES:  So that's why 40 percent.  And I

13     understand your point, usually it's higher, but it absolutely

14     qualifies here.

15          And so what happens after this tying, as I was saying

16     just a minute ago, your Honor?  Antitrust law is an imposition

17     on trader, on business freedom.  It is.  The Congress has

18     decided there are more important qualities than, you know,

19     freedom of contract, freedom to sell.  So there is a rule

10:49 20     against tying when the one doing the tying has monopoly power.

21     If they get it, they could tie together anything they want.

22          So what happens after this change?  Given this fourth

23     choice, hospitals choose Verax about 5 percent of the time.

24     It's not in the complaint, admittedly, your Honor, but my

25     client told me it's around 1 percent.  They're going out of

1    business.  They're being completely driven from the market

2    because of this, because of this tying.

3          Now, your Honor, you did mention earlier, and I

4    understand your point, that, "Oh, this is a complicated case,

5    this is very different," and I would beg to differ because this

6    is really how you should look at the case.  This is --

7          THE COURT:  You know, I was struggling to figure out

8    what that was a picture of.

9          MR. ABELES:  Sure, so that's tuna salad on your left.

10:50 10          THE COURT:  That's a salad, not a bowl of oatmeal?

11          MR. ABELES:  No.  Thank you, your Honor.  That is a

12    bowl of tuna salad, and, of course, you see what the product is

13    on the right.  Their argument is that because you have to

14    combine Bumble Bee tuna with mayonnaise to make tuna salad,

15    then Bumble Bee tuna -- this is the argument -- Bumble Bee tuna

16    does not participate in the market for tuna salad.  That's

17    their argument.  And it may be, your Honor, that in a weird

18    case like this one, after expert discovery and so forth, the

19    facts may show that Bumble Bee tuna has such grand equity that

10:51 20    people wouldn't substitute to a readymade salad.  But you can't

21    say it's a matter of law that Bumble Bee tuna, because it has

22    to be mixed with mayonnaise, does not compete in the market for

23    tuna salad.

24          And this I would encourage you to think about when you

25    think about this question of we're not a perfect substitute.

1    Neither is Bumble Bee for the tuna salad you see on the left.

2        So where are they going wrong?  Why do they end up in

3    this place, your Honor?  It's because they're focusing on the

4    supply side, differences on the supply side, when they need to

5    be focused on the demand side.  This is a First Circuit case,

6    but it's quoting a very important Supreme Court case called

7    *Brown Shoe*, in which, you know, when you want to figure out

8    who's in the market, you look at the cross-elasticity of

9    demand.  And that's just a fancy way of saying, changes in

10:52 10    demand of one product impact inversely the demand of another

11    product, and if that happens to a significant degree, they're

12    in the same market.

13        And what did we just see?  What did we just see?  We

14    saw a change in demand, market demand, 75 percent.  We saw a

15    change in demand, an artificial depression of our market share

16    and artificial elevation of the Red Cross's, and a complete

17    shift in share.  That's cross-elasticity of demand.  That's

18    exactly what cross-elasticity of demand means, and that's what

19    you should be focused on, not the supply side differences that

10:53 20    the Red Cross emphasizes.

21        Now, the second point is also very -- this is from a

22    Supreme Court case called -- it's known as *AmEx*, *Ohio v. AmEx*,

23    but what it's quoting is an even more important Supreme Court

24    case called *United States v. Grinnell*.  Let me tell you about

25    that for a moment because it has force here.  In *Grinnell* the

defendant sold safety systems, burglar alarms, fire alarms and
so on.  The claim was, "Hey, a burglar alarm is not a perfect
substitute for a fire alarm.  So you only sell fire alarms;
you're not in this market."  And what Grinnell said and what
Ohio picked up on is that "Wait a minute.  We need to focus on
commercial realities here.  That's what we do.  If you need to
combine different products and services like these two into the
same market in order to reflect commercial realities, you
should do so," and that's what happened in Grinnell.  It was
basically a home safety market that featured a bunch of
different --

             THE COURT:  Can I just say that I understand that
we're not really here for the motion to dismiss, but assume for
a minute that the Red Cross believes, in good faith, that their
technique, which is FDA approved, is the better one and
provides a better product, why can't they sell the product that
they think is the best?

             MR. ABELES:  It's the same answer as before, your
Honor:  There is a rule against tying when there's a monopolist
who can force the choice of its consumers.

             THE COURT:  They're not really in the market of
producing these cleaning products.

             MR. ABELES:  So, your Honor -- and thank you for
bringing that up -- so they sell bacteria mitigation services.
They use machines that they buy, of course, they use machines

that they buy to sell a service, bacterial mitigation services,
which uses the Cerus technology.  But you don't focus on the
inputs, okay?  You focus on the outcomes:  What are they
providing?  So they sell blood.  If you want PRT instead of a
primary culture, an LVDS blood platelet, you pay $150 extra.
That's how you know that these are products tied together and
that ARC is providing this service in this market.

In order to perform the service, they've got to buy
some things.  They've got to buy this PRT system.  But then
they resell that to their customers in competition with the
other players in the market.  That's just the answer to that.

THE COURT:  So you're basically saying, any producer
of a product that picks one element of that product that's more
expensive is basically tying, not offering the customer a
cheaper element?

MR. ABELES:  I didn't understand.

THE COURT:  Like a car.  Let's say you have a car, and
you want one form of a carburetor rather than another form even
if it's more expensive, you'd say that's tying the carburetor,
even if you don't sell carburetors?  Maybe that's a bad example
but --

MR. ABELES:  Okay, let's say this, your Honor, and if
I'm not understanding it, then -- and I didn't mean to
interrupt you -- there's a monopoly of cars, which there is.
But let's say there's a car seller with fifty percent of the

1  market, if --

2          THE COURT:  Likes one carburetor rather than the other

3  because they think --

4          MR. ABELES:  Well, the carburetor, that kind of goes

5  into the --

6          THE COURT:  Into the car, right.

7          MR. ABELES:  That's an element of the car.  That's not

8  a separate part of the car.  That's not a service.  So if this

9  monopoly car seller required you to go to his car wash, and I'm

10:56 10  a car wash owner and I perform car wash services, if they're

11  exploiting their monopoly in order to threaten a monopoly in

12  the car wash business, that's a problem.  When it's all part of

13  the same product, yeah, you don't break apart the car.  We

14  can't break apart that blood --

15          THE COURT:  Why isn't that a closer analogy, because

16  you're basically selling just the little bag of blood?

17          MR. ABELES:  You're selling a bag of blood that's had

18  a service performed on it, a bacterial mitigation service.

19  Today, by the way, your Honor, they still are.  They're not

10:57 20  selling all PRT.  They're selling some platelets that are

21  primary cultured.  They use the LVDS technology and so forth.

22  So it's not one product.  And this is reminiscent of Microsoft

23  which tried to argue that "Hey, our browser, that's really a

24  fundamental part of our operating system," so this is a good

25  example, your Honor, based on the car.

1          THE COURT:  All right, I see.

2          MR. ABELES:  So Microsoft said, "Hey, look, this

3    browser in our operating system, they're all integrated, and

4    they all work together as one operating system."  And the court

5    said, "No.  No, these are separate.  These are separate.

6    There's a browser market and there's an operating system

7    market."  And Nexgate, which was the foreclosed competitor

8    there, nobody said to Nexgate, "Hey, you don't sell operating

9    systems that have browsers integrated into them.  You don't

10   sell tuna salad.  You just sell mayonnaise.  You just sell

11   Bumble Bee."  That was not an argument because it would not

12   have worked.  You don't have to have an identical -- that's why

13   tying is so powerful -- you don't have an identical product

14   line when you're (Inaudible).

15          And so when you look at the cross-elasticity of

16   demand, not the supply differences, and when you look at the

17   commercial realities, you can see that they participate in the

18   same market.  And *Jefferson Parish* is actually a good example

19   of this commercial realities.  *Flamingo* goes to a point that

20   you focused on earlier, your Honor.  They acquired, they

21   bought -- as ARC emphasizes, "We buy this technology" -- they

22   bought anesthesia services.  They had a contract with a

23   third-party anesthesia group, and then they offered that as a

24   bundle.  I'm not saying they used this term "commercial

25   realities," I don't remember if they did, but they made the

1    same point.

2            What you do is, you look at whether this arrangement

3    has the competitive consequences that tying addresses.  Of

4    course, that's the competitive concept.  And so, you know,

5    *Jefferson Parish*, while it has a footnote that the other side

6    finds interesting, the actual case and the actual tie that was

7    offered there, that's really what's worth focusing on here.

8            There is insinuation in the briefing -- I guess I

9    didn't hear it in the oral argument, but there was a line

11:00 10   somewhere along the line, "It's not illegal for us to use

11   your product."  I'm not sure if they said that, but there's an

12   insinuation, but I just want to end that debate because there

13   is not a legal --

14           THE COURT:  Not a legal?  I'm sorry, I don't

15   understand.

16           MR. ABELES:  So it's a point that you caught earlier

17   with counsel, your Honor, that these are all FDA-approved

18   products.  They are allowed to primarily culture their -- they

19   are in compliance when they sell not just PRT platelets but

11:01 20   platelets that have been primary cultured as well, which our

21   product, like the Bumble Bee, works with another, like the

22   mayonnaise, and that is the primary culture product.

23           So because they do compete, because when you look at

24   the cross-elasticity of demand and you see a share shift

25   between these two entities, and when you look at the commercial

1    realities -- we were the driving force in the market, they tied

2    their product, we lost our market share -- you can see that

3    they are in the same market, and we've certainly plausibly

4    alleged exactly what happened.

5         THE COURT:  But isn't it -- you know, sometimes you

6    see sort of, like, the Cerus product is a disruptive

7    technology.  It may be that it was better.

8         MR. ABELES:  That's why we'll have a trial, we'll have

9    summary judgment and a trial, and maybe that's the case, your

11:02 10    Honor.  I don't think -- I think there's a reason that the

11    market favored our product.  It's equally effective.  Blood

12    that's contaminated does not go into a person after our test is

13    used, and that's what the FDA cares about.  That's why it has

14    three ways to make sure contaminated blood doesn't get into a

15    person.  But I think what you're going to see as this case

16    progresses, your Honor, is the reason that the market favored

17    our product is, it doesn't lead to degraded platelets.  You use

18    less blood.

19         THE COURT:  Well, it's cheaper.

11:02 20         MR. ABELES:  It's cheaper.

21         THE COURT:  The question is, how much are you willing

22    to pay for the perfect blood as opposed to maybe someone

23    catching something else, some other kind of disease other than

24    something to prevent sepsis?  But what you're saying is that I

25    have to wait for a trial for that, so I --

1          MR. ABELES:  Well, I just don't think that counsel for

2     Verax and counsel for ARC to get into it the day at the motion

3     to dismiss level --

4          THE COURT:  I agree with that.

5          MR. ABELES:  -- is better.  But I think that despite

6     theirs being more expensive, I disagree with this notion that

7     they're the disrupter and all that.  There's a reason that the

8     market favored our product, your Honor, and I think that --

9          THE COURT:  And you'd say not just price?

11:03  10          MR. ABELES:  Absolutely not just price.  And let me

11     just emphasize this one more time, your Honor:  When you use

12     the PRT technology, it reduces the quality; it degrades the

13     quality of the platelets, so somebody who gets transfused needs

14     more transfusions, which are dangerous.  That's why there's all

15     these rules.  The hospital has to buy more platelets.  So this

16     tie not only allows them to sell this tying process at, you

17     know, a monopoly price, obviously; there's no reason they would

18     charge anything less because people need to buy it.

19          So not only you're paying -- let me complete that

11:04  20     point.  Sorry, your Honor.  Not only are you paying more for

21     the tied product, the service, you're paying more -- you have

22     to buy more blood because the platelets are degraded by

23     30 percent or something like that via the PRT.  So this tie

24     actually -- this is rare -- this actually helps them on both

25     sides of the tie.  They make a monopoly profit on the tied side

1    and on the tying side.

2           And so these points, your Honor, the fact that they

3    compete, it costs less, elasticity of demand proves it, the

4    commercial realities prove it.  It defeats each one of the

5    arguments that they raise.  Because ARC and Verax are

6    competitors, Verax's foreclosure is an antitrust injury and

7    Verax's standing.  ARC is not a buyer in the tied market; it is

8    a seller.  It charges separately for its bacterial mitigation

9    service.  It's a distinct product.  Obviously we're their

11:05 10   competitor.  We only sell this.  It's separate from blood

11   platelets.  And foreclosure of competition from Verax and all

12   others is harm to competition.  This is absolutely not a case,

13   your Honor, in which we are just claiming harm to ourselves,

14   okay?

15           As I mentioned, if there was an innovative firm that

16   offered a product that was ten times better than all the

17   products you see here and one-tenth the price, how many sales

18   would they get in the market?  Zero, zero, because they're

19   foreclosed from this market because of the bundle.  That is

11:06 20   harm to competition, along with our foreclosure, which is

21   almost always considered a harm to competition.  There's a

22   foreclosure of another competitor, bioMerieux, as well.

23           And look at this.  I mean, the harm to competition is

24   obvious.  Higher prices, we think lower quality, that's what

25   we're going to argue, but we'll see, for a product that when

1    they had a free choice, the hospitals, most of them did not

2    want.

3            Thank you, your Honor.

4            THE COURT:  Thank you.

5            All right, so I think we do have a few minutes to talk

6    briefly about the torts.

7            MS. GIORDANO:  Could I just spend 30 seconds on the

8    antitrust claims, one more moment, your Honor?  Just two quick

9    points?  Is that okay?

11:07 10            THE COURT:  Yes.

11            MS. GIORDANO:  One is -- I want to underscore this

12    because I didn't hear it in anything Mr. Abeles said -- federal

13    law does not permit the Red Cross to sell platelets unless we

14    have done one of the three approved types of bacterial

15    mitigation.  That's why the tuna, the Microsoft, those

16    analogies do not work.  If federal law said you cannot sell

17    tuna fish unless you have mixed it with mayonnaise, that would

18    not be a tie either.  There would be nothing wrong with selling

19    tuna fish mixed with mayonnaise if federal law says that's the

11:07 20    only way you can sell it.  And federal law says we have to do

21    one of those three things.  Verax just doesn't like the one of

22    the three that we picked.

23            The second thing I want to say is, we will be able to

24    show that almost everything Mr. Abeles just told you is not

25    true in the real world facts, but I can't do that here today.

1    It's a motion to dismiss, and I don't want to --

2        THE COURT:  It's making me hungry for a tuna fish

3    sandwich.

4        MS. GIORDANO:  I don't want to take us backwards, but

5    it is a reason Congress does not want us to be subject to the

6    Sherman Act, because we are at risk of having to spend a lot of

7    money to try to explain the real-world facts, these claims are

8    not true; and that's going to waste resources that we are

9    supposed to be using to do the important task Congress has

10   given to us.  Thank you.

11       MR. ABELES:  Your Honor --

12       THE COURT:  I gave her extra.  You can go.

13       MR. ABELES:  Your Honor, I will always stand corrected

14   if I make a misstatement, but I've spent a lot of time talking

15   with my experts, which are my clients, and they agree with me.

16   And I believe that everything I said was true, but I'm

17   certainly not misleading the Court, and I just kind of

18   generally object to this naked insinuation.

19       THE COURT:  All right, thank you.  Let's go to the

20   torts because I was trying to think out loud.  I just think

21   that this is a very, very difficult case, and I understand

22   antitrust.  If I were to say that the Red Cross was a person

23   and it was a viable claim -- I'm not saying I'm going to do

24   that -- would that be something that would make sense to go up

25   on an interlocutory basis?  If I say it's not a person and I

say but there are potential tort liabilities, I think I'd keep

it to work through the tort liabilities.  I'm just trying to

figure out a pathway that makes sense because, of course, I'm

going to stay discovery till I sort this all out.

I recently had a very close insurance case Law 360 is

saying they had vigorous debates about, but the First Circuit

took it on an interlocutory basis, so -- and I recommended that

they take it because why spend all the money litigating?  I

think the personhood thing is very difficult myself.  There are

really strong arguments both ways.  It almost should be one of

these law school moot courts.  Maybe I'll suggest that to the

law school.

But why don't we just briefly walk through these torts

and think about that issue.  Or maybe what we should do is just

see how I come out, which I honestly don't know right now, and

then ask you your views on that issue.

MS. GIORDANO:  Okay, thank you, your Honor.  Yes, I

think that that sounds like a very sensible way to proceed.  I

do think the person issue is so important enough to the Red

Cross and so fundamental to the outcome of this particular case

that it would be a perfect candidate for that review, depending

on how you came out.

THE COURT:  My law clerks and I will sort through it.

All right, go ahead.

MS. GIORDANO:  Thank you.  Okay, we are -- wow,

1    there's a lot here today.  Let me see if I can get my slides up

2    on state law claims.  So --

3            THE COURT:  I'm happy, by the way, if you're all

4    tired, to just rest on the papers on it.

5            MS. GIORDANO:  I would be happy to do it.  If

6    Mr. Abeles wanted to do that, that would be fine.

7            MR. ABELES:  I think those issues are squared up for

8    your Honor in the papers and reiterate some of the points that

9    we made, but if that's not going to be helpful to you, then

11:11 10   this might be a place to stop.

11           THE COURT:  Okay.  Well, I will look at the papers on

12   the torts.  You should not expect an opinion soon.  I like to

13   say that, but I think discovery needs to be stayed because I

14   really am not -- on this threshold issue, it's just a very

15   difficult issue of personhood.  And the question I always ask

16   everybody, so it's not meant to be any kind of indication of

17   anything, has there been any talk of settlement?

18           MR. ABELES:  No, your Honor.

19           THE COURT:  Is there any interest in that?

11:11 20       MR. ABELES:  We're always open to speaking with the

21   defendant about potential settlement.

22           MS. GIORDANO:  We would always welcome a conversation

23   as well, your Honor.

24           THE COURT:  One thing that comes to mind, suppose you

25   had a hospital chain that wanted to go with the two-step, would

1    the Red Sox be willing -- Red Sox, it shows you where my mind

2    is at -- would the Red Cross be willing to sell to that

3    hospital with the one step?

4         MR. ABELES:  I'm sorry?

5         THE COURT:  What?

6         MR. ABELES:  Was that a question for me, your Honor?

7         THE COURT:  I'm just thinking about, is that a way to

8    settle this?  Not with money but with an agreement that, let's

9    say, one of these mega chains?

11:12 10      MR. ABELES:  If they wanted to undo their tying, your

11   Honor, then I think we would seriously consider --

12        THE COURT:  Well, no.  They tie it unless the

13   hospitals demand something else.

14        MR. ABELES:  The hospitals did demand something else,

15   your Honor.  Seventy-five percent of them did.  They can't buy

16   our product anymore.  They don't need it.

17        THE COURT:  Excuse me.  The 75 percent bought it

18   before.  I mean, I'm just saying.  I don't know the position of

19   the Red Cross on that, but, anyway, I don't pretend to know

11:13 20   this industry well.  I just got to it in the last week.  So I

21   just wanted to know whether you wanted to think about that at

22   all and go to a mediator or whether you just need some

23   threshold rulings.

24        MS. GIORDANO:  I think we need some threshold rulings

25   in this particular matter, your Honor.  We are always open to a

1   conversation -- I don't want to suggest that we are not -- but

2   I think that these threshold issues are so critically important

3   to really even being able to have those conversations, that I

4   do think we need to know sort of some of these threshold issues.

5           THE COURT:  Well, I get it.  So I will take this under

6   advisement.  All discovery is stayed, and I'll do my best.  I

7   said to my law clerks and they said to me back, "This is

8   excellent briefing."  You don't usually get such high-quality

9   briefing on everything.  And I loved, loved the slides, so

11:13 10   thank you very much.

11           MR. ABELES:  Thank you, your Honor.

12           MS. GIORDANO:  Thank you, your Honor.

13           THE COURT:  Thank you.  Bye-bye.

14           (Adjourned, 11:14 a.m.)

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

   UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS    ) ss.
   CITY OF BOSTON               )

5

6

7          I, Lee A. Marzilli, Official Federal Court Reporter,

8  do hereby certify that the foregoing transcript, Pages 1

9  through 67 inclusive, was recorded by me stenographically at

10 the time and place aforesaid in CA No. 23-10335-PBS, Verax

11 Biomedical Inc. v. American National Red Cross, and thereafter

12 by me reduced to typewriting and is a true and accurate record

13 of the proceedings.

14         Dated this 3rd day of October, 2023.

15

16

17

18

19         /s/ Lee A. Marzilli
           _____
20         LEE A. MARZILLI, CRR
           OFFICIAL COURT REPORTER
21

22

23

24

25